Filed 1/16/14 (unmodified opn. attached)

## CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| ASAHI KASEI PHARMA CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ACTELION LTD., et al.,<br><br>    Defendants and Appellants. | A133927<br><br>**ORDER MODIFYING PARTIALLY PUBLISHED OPINION**<br>**[NO CHANGE IN JUDGMENT]**<br><br>(San Mateo County<br>Super. Ct. No. CIV478533) |

**BY THE COURT:**[1]

The opinion in the above-entitled matter filed on December 18, 2013, was certified for publication with the exception of parts II.B., II.C., II.D., and II.E.  On January 7,

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C.3., II.C.4., II.D., and II.E.

[1] Before Jones, P.J., Needham, J., and Bruiniers, J.

2014, a nonparty request for full publication was filed pursuant to California Rules of Court, rule 8.1120(a).  Pursuant to California Rules of Court, rules 8.1105(b)(2), (b)(4), (c), and 8.1110, and for good cause appearing, this court grants that request in part and orders the opinion certified for publication with the exception of parts II.B., II.C.3., II.C.4., II.D., and II.E.

IT IS FURTHER ORDERED that the opinion filed on December 18, 2013, is modified as follows and the petitions for rehearing are DENIED:

1. On page 5, in part I, the first sentence and first clause of the second sentence of the second full paragraph are amended to read:

> Actelion had been following Ventavis since 2002 and had considered acquiring CoTherix to get rights to the drug, but as late as May 29, 2006, considered the company a second-rate opportunity because of Ventavis's shortcomings. Shortly after the June 28, 2006 public announcement of the License Agreement, Martine noted Fasudil's promise and the company began to explore the option of acquiring CoTherix.  In July 2006,

2. On page 14, the entire paragraph in part II.A.2. is amended to read:

> We independently review Defendants' legal challenge to the scope of potential liability for the tort of intentional interference with contract.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800.)

3. On page 49, in the first paragraph of part II.C., the third sentence is amended to read:

> The jury also awarded Asahi $187.4 million in development costs and $75,000 in investigator-sponsored study costs that CoTherix would have incurred for Asahi's benefit to bring Fasudil to market if it had continued to perform under the contract.

4. On page 49, in part II.C., footnote no. 25 is amended to read:

[25] The jury award of $450,000 in IND/Regulatory maintenance costs is not separately challenged here.

5. On page 52, in part II.C.2.a., the fourth sentence of the second full paragraph is amended to read:

Increases in creatinine levels shown in the IR Fasudil studies were not clinically significant except at high doses. Increases in creatinine levels in ER Fasudil studies were not clinically significant and were reversible.

6. On page 62, in part II.C.3.b., footnote no. 33 is amended to read:

[33] This analysis also applies to the award of investigator-sponsored study costs insofar as studies of inhaled Fasudil is concerned. Because Actelion does not attempt to segregate the amount of such costs that were attributable to inhaled Fasudil versus other formulations of Fasudil, it has forfeited any argument that a portion of the award of these costs should have been included in the remittitur. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [appellate court may deny claim on appeal that is unsupported by argument or citations to the record].)

7. On page 63, in part II.C.3.b., footnote no. 34 is deleted (with all following footnotes renumbered accordingly).

8. On page 63, a new final paragraph of part II.C.3.b. is added to read:

Actelion further argues that the award was not supported by substantial evidence of proximate causation. However, CoTherix was obligated to pursue development of inhaled Fasudil as long as the License Agreement remained in effect, and the evidence that oral Fasudil was likely to be approved and sold as anticipated supports the inference that, absent interference by the Defendants, the License Agreement would have remained in effect through 2019.

9. On page 64, in part II.C.4., the first sentence of the first full paragraph is amended to read:

> On the evidence presented at trial, the jury reasonably could have found that—absent Actelion's tortious interference—CoTherix would not have exercised its termination right in 2009 or any time before 2019.

10. On page 67, in part II.D.1., lines 10 through 16 of the first partial paragraph are amended to read:

> Indeed, several comments attributed to the Individual Defendants themselves are consistent with the comments that Actelion attempts to set apart:  Simon's notes of an August 28, 2006 telephone conference could be construed to suggest that Actelion should "mudsling . . . Fasudil['s] great promise," and Simon wrote on the eve of the acquisition that if Asahi balked at the contract termination, "we could discuss risk-benefit ratio and the need to discuss several issues with the FDA before proceeding!  I think [we] will be able to deal with them effectively!"  Jean Paul personally wrote the March 23, 2007 letter indicating that Actelion might make adverse statements about Fasudil's safety to the FDA and the public if it was unable to resolve its dispute with Asahi and the jury reasonably could have found that this letter was a wrongful threat.  And Martine

The modification effects no change in the judgment.

Date_____                    _____ P.J.

Filed 12/18/13 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ASAHI KASEI PHARMA CORPORATION,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>ACTELION LTD., et al.,<br><br>     Defendants and Appellants. | A133927<br><br>(San Mateo County<br>Super. Ct. No. CIV478533) |

     Asahi Kasei Pharma Corporation (Asahi) is a Japanese corporation which develops and markets pharmaceutical products and medical devices.  One of its products is Fasudil, a drug which Asahi sought to market in the United States (U.S.) for treatment of pulmonary arterial hypertension (PAH).  In order to obtain regulatory approvals for Fasudil, and to develop and commercialize it in North America and Europe, Asahi entered into a licensing and development agreement (the License Agreement) with CoTherix, Inc. (CoTherix), a California-based biopharmaceutical company focused on developing and commercializing products for the treatment of cardiovascular disease. Appellant Actelion Ltd. is a Swiss pharmaceutical company that markets a PAH treatment drug, bosentan (under the tradename Tracleer), and holds the dominant share of the relevant market.  Actelion Ltd., through a subsidiary, acquired all of the stock of CoTherix, and concurrently notified Asahi that CoTherix would discontinue development of Fasudil for "business and commercial reasons."

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., II.D., and II.E.

Asahi filed suit in the San Mateo County Superior Court against CoTherix, Actelion Ltd., Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc., Actelion U.S. Holding Company (collectively Actelion), as well as three Actelion executives.[2]  The case went to trial on four of Asahi's claims:  intentional interference with the License Agreement; interference with Asahi's prospective economic advantage; breach of a confidentiality agreement between Actelion and CoTherix (on a third-party beneficiary theory); and breach of confidence.[3]  The jury returned a unanimous liability verdict against Actelion and the Individual Defendants (collectively Defendants), awarding nearly $546.9 million in compensatory damages, and finding that all Defendants acted with malice, oppression or fraud.  The jury awarded punitive damages against the Individual Defendants.  Posttrial, the court offset the verdicts for the amounts previously awarded to Asahi in an International Chamber of Commerce arbitration proceeding (ICC Arbitration) against CoTherix.  Defendants' motions for judgment notwithstanding the verdict were denied.  The trial court denied a motion for new trial on damages, conditioned on Asahi's acceptance of a remittitur of certain damage categories.

Defendants contend, inter alia, that any actions taken to interfere with the License Agreement were privileged and not actionable, and that Asahi's damage claims are speculative and unsupported.  The Individual Defendants further challenge the award of punitive damages.  Asahi cross-appeals from the conditional new trial order.  In the published portion of this opinion we address the scope of liability for tortious interference with a contract by a nonparty to the contract, and we affirm the judgment in favor of Asahi.  In the nonpublished portion of our decision we reject the challenges of Actelion

---

[2] These executives are Jean-Paul Clozel (cofounder and chief executive officer), Martine Clozel (cofounder and chief scientific officer), and Simon Buckingham (worldwide director of corporate and business development).  For clarity and consistency with their briefing on appeal, these parties are referenced by first name or collectively as the Individual Defendants.

[3] In *Asahi Kasei Pharma Corp. v. CoTherix, Inc.* (2012) 204 Cal.App.4th 1 (*Asahi I*), we affirmed the trial court's grant of summary adjudication of Asahi's claims under the Cartwright Act, the California antitrust statute (Bus. & Prof. Code, § 16700 et seq.).

and the Individual Defendants to the trial court's evidentiary rulings and to the damage awards, and we deny Asahi's cross-appeal.

## I.     BACKGROUND AND PROCEDURAL HISTORY

While many of the underlying facts were vigorously disputed at trial (and in the briefing on this appeal), we focus on the evidence and inferences supporting the judgment. (*Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 443 [we imply "all necessary findings supported by substantial evidence" and " 'construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance' "].)[4]

Fasudil was originally formulated in 1984 for intravenous use in treatment of cerebral vasospasm after subarachnoid hemorrhage, a type of stroke, and received regulatory approval in Japan for this use in 1995. Asahi later secured approval in China. Fasudil is protected by a "composition of matter" patent covering the molecule until 2016, and by a formulation patent until 2019.

In 1997, new research showed Fasudil could inhibit a human body protein known as Rho-kinase, which contributes to constriction of smooth muscle in arterial blood vessels. Studies found inhibition of Rho-kinase could slow or even reverse cellular changes associated with certain diseases. One such disease is PAH, a chronic, progressive and often fatal disease that is characterized by severe constriction and obstruction of the pulmonary arteries. Studies indicated that Fasudil had the potential to promote healing of blood vessel lesions and limit the scarring associated with PAH.

Development of Fasudil for new medical uses was commercially attractive to Asahi if it could be done expeditiously. To recoup investment, a drug must be developed

---

[4] Defendants do not directly argue that the jury's determination of tortious interference is unsupported by substantial evidence. We would in any event agree with Asahi that such an argument would be forfeited due to Actelion's failure to present a full and fair summary of the evidence supporting the judgment. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 739.)

sufficiently early in its patent life to ensure an adequate period of market exclusivity after receipt of regulatory approval and before generic competition arrives.

In order to gain regulatory approvals necessary for new medical uses of Fasudil, Asahi entered into the License Agreement with CoTherix on June 23, 2006. CoTherix had previously obtained regulatory approval for its own inhaled PAH treatment drug, Ventavis. Under the terms of the License Agreement, CoTherix agreed to obtain U.S. and European regulatory approvals for Fasudil to treat certain diseases, and to develop and commercialize it in those markets. CoTherix was to develop oral and inhaled formulations of Fasudil for treatment of PAH, and an oral formulation of Fasudil for treatment of stable angina (SA). It was required to use commercially reasonable efforts to develop Fasudil, and to obtain U.S. regulatory approvals for Fasudil as soon as reasonably practicable. (*Asahi I, supra*, 204 Cal.App.4th at p. 4.) Pursuant to the License Agreement, CoTherix prepared a development plan projecting that it would complete development and file for regulatory approval of extended release oral Fasudil (ER Fasudil) for treatment of SA in 2009, ER Fasudil for treatment of PAH in 2010, and inhaled Fasudil for treatment of PAH in 2011. Asahi considered CoTherix's ability to move quickly in clinical development of Fasudil to be particularly important to preservation of Fasudil's market exclusivity before facing generic competition.

Actelion Ltd. has, since December 2001, marketed Tracleer, an endothelin receptor antagonist and oral PAH drug that has been approved by the Food and Drug Administration (FDA) for use in the U.S.[5] Tracleer is what is known in the pharmaceutical industry as a "blockbuster" drug, generating over $1 billion in revenue annually, and Actelion has held the dominant share of the relevant market. In 2006, 98 percent of Actelion's U.S. revenues were dependent upon Tracleer sales. (*Asahi I, supra*, 204 Cal.App.4th at p. 5.)

---

[5] Martine discovered bosentan (Tracleer) in 1990, while employed by the pharmaceutical company Hoffman-LaRoche.

At trial, Asahi presented evidence that Actelion acquired CoTherix specifically because it saw Fasudil as a significant threat to its market dominance with Tracleer and that Defendants used unlawful means to stop the development of Fasudil, thereby interfering with the License Agreement. Specifically, Asahi argued that Defendants used extortion and fraud to "painstakingly kill[]" Fasudil as a competitive product.

Shortly after the June 28, 2006 public announcement of the License Agreement, and at the behest of Martine and Jean-Paul, Actelion began to explore the option of acquiring CoTherix. About July 18, a director of business development for Actelion Pharmaceuticals Ltd., Carina Spaans, referenced CoTherix, Fasudil and another company in her notes, with the following comment: "Buying both companies will leave the market for Tracleer free for Actelion." Negotiation of an acquisition of CoTherix began in August. Martine personally conducted due diligence on Fasudil in early October. Ultimately, Martine recommended returning Fasudil to Asahi, after noting "potential pricing issues if [F]asudil was also working in PAH." "[F]rom the beginning, Martine was of the opinion that [Actelion] would not go ahead with Fasudil." Martine's conclusions were shared with Jean-Paul. Meanwhile, in late October, the results of CoTherix's Phase I study were promising. The plan was to move ahead with the Phase II clinical study in early 2007. CoTherix had ordered supplies of ER Fasudil for Phase II clinical use. On November 19, 2006, Actelion U.S. Holding Company and CoTherix signed an agreement and plan of merger, which was publicly announced the following day.

Beginning November 20, 2006, Asahi repeatedly sought assurances from CoTherix and Actelion that Fasudil development would continue after the proposed merger. These requests for assurances were forwarded to Simon and Jean-Paul. By November 23, Jean-Paul had decided, with input from Martine and Simon, that Actelion was not interested in pursuing development of Fasudil. Actelion drafted a letter to Asahi as early as October 31, stating it would not develop Fasudil, but decided not to send the letter as "part of a strategy." Instead, Actelion "decided to let any correspondence go through [CoTherix President] Don Santel—but to state that no decision has been made."

Despite Actelion's knowledge that failure to provide assurances might constitute material breach of the License Agreement, no assurances were provided. In mid-December, Asahi requested a videoconference with Actelion. Although Simon was aware of the prior decision and believed the videoconference "may be a bit of a waste of time," he and Martine participated on December 20, and did not disclose that a decision had already been made. Instead, Simon told Asahi "it was a very productive meeting for Actelion to [help] make their decision to pursue [F]asudil after the completion of [the] merger. . . . Actelion does not have an intention to make any delay of [F]asudil development." On January 3, 2007, CoTherix, after conferring with Actelion, told Asahi: "[W]e continue to honor our agreement to move [F]asudil forward. Please note that I have no power to compel Actelion to provide you with the response you desire."

On January 4, 2007, Simon wrote to a colleague: "[P]lease follow up with Asahi later next week . . . . If things go according to plan we should have 90%+ of shares by Monday evening. [¶] Since we will issue a press release the next day, I think you should probably call [Asahi] to explain our position. Then follow up with the letter that you drafted. I double-checked with [Jean-Paul] today and he definitely agrees we should give Fasudil back to them. We should use the 'portfolio priorities' reason . . . . If they get silly and want to discuss penalties, etc., we could discuss risk-benefit ratio and the need to discuss several issues with the FDA before proceeding!" The next day, Simon told Asahi: "If and when we can be more certain that the proposed transaction will close, we will contact you again regarding Fasudil. We expect that we will know more next week. Until then, CoTherix has assured us that the Fasudil programme is proceeding as planned." On January 9, Actelion acquired all of the stock of CoTherix and concurrently notified Asahi that it was discontinuing development of Fasudil for "business and commercial reasons."

Attempts to negotiate a termination agreement were unsuccessful. On March 6, 2007, Asahi notified CoTherix that, by failing to confirm and commit in writing 30 days prior to the change of control that Actelion would not interfere with CoTherix's obligations, it was in material breach of the License Agreement. Recognizing that Asahi

was "resigned to the fact that it is probably all over for [Fasudil] ex-Japan," Simon suggested that Jean-Paul might need to communicate directly with Asahi's president.

Ultimately, on March 23, 2007, Jean-Paul wrote: "As you are aware, [b]usiness executives at Actelion (on behalf of CoTherix) and Asahi have discussed the termination conditions for the [License Agreement] several times over the last few months and we have reached a point of dispute regarding the payment for product supplies. . . . [¶] . . . [¶] . . . [W]e have serious concerns over the long-term safety (in particular renal safety) with chronic [Fasudil] dosing. Actelion feels that this risk/benefit ratio issue is sufficiently serious for us to consider the need to inactivate or even withdraw the U.S. IND[6] and inform the Japanese authorities. [¶] In addition, for public disclosure reasons, since the amount you have requested is very high, in case we would really pay it, we would be obliged to announce this payment and the reasons why we decided to discontinue the development of [F]asudil." Asahi viewed these as threats. An Actelion witness testified that these were tactics discussed and "employed in the hopes that it would speed up negotiations."

On April 3, 2007, Asahi sent notice of the termination of the License Agreement. Jean-Paul later wrote to Asahi's president: "Since Asahi is now ready to receive the IND, Actelion personnel will be appointed, on behalf of CoTherix, to supervise the transfer . . . . We shall inform the FDA of our decision to stop development . . . together with the reason for this decision. . . . [¶] . . . [¶] Actelion is preparing an upcoming Press Release to disclose that [F]asudil will no longer form part of the Actelion pipeline and explain the rationale for our decision . . . ."

Thereafter, on April 18, 2007, Actelion filed a clinical study report with the FDA, for the Phase I study of ER Fasudil. The report concluded: "[O]verall, [F]asudil ER was well tolerated, the changes in the clinical safety assessments were not clinically significant, and all subjects completed the study." On April 19, 2007, Actelion issued a

_____

[6] An IND is an "Investigational New Drug Application" submitted to the FDA to obtain approval for human clinical testing. (21 C.F.R. § 312.1 et seq. (2013).) An IND for Fasudil had been approved by the FDA.

press release stating only: "After careful review, Actelion has decided not to pursue further development with [F]asudil. Accordingly, the related agreement with [Asahi] had been terminated."

*The Litigation Below*

Asahi first initiated the ICC Arbitration proceeding, against CoTherix only, claiming breach of contract. Among other damages, Asahi claimed the value of development work CoTherix failed to perform through June 2009 and development-based milestone payments. On December 15, 2009, the arbitrators awarded Asahi over $91 million.[7]

Asahi filed the instant litigation on November 19, 2008, naming CoTherix and the Actelion entities. The Individual Defendants were added by doe amendments to a first amended complaint in June 2009. The operative third amended complaint was filed on October 23, 2009. The complaint set forth eight claims: intentional interference with contract (Claim 1); interference with prospective economic advantage (Claim 2); breach of a confidentiality agreement[8] (Claim 3); in the alternative to Claims 1 and 2, breach of the License Agreement (Claim 4); conspiracy in restraint of trade pursuant to the Cartwright Act (Claim 5); false advertising pursuant to Business and Professions Code section 17500 et seq. (Claim 6); unfair competition pursuant to Business and Professions Code section 17200 et seq. (Claim 7); and breach of confidence[9] (Claim 8).

Pretrial Motions

Asahi moved for summary adjudication of several of the affirmative defenses asserted by Actelion. The trial court also granted Asahi's motion for summary adjudication of the "manager's privilege" asserted by Actelion and by the Individual

---

[7] CoTherix paid the award in full shortly thereafter.

[8] In connection with the acquisition of CoTherix, Actelion and CoTherix entered into an agreement to keep confidential the proprietary information of Cotherix and of any third party who provided the information to CoTherix under a confidentiality agreement.

[9] Asahi alleged that Defendants obtained confidential/proprietary information about Fasudil during their CoTherix due diligence, and misused this information by disparaging Fasudil and extorting Asahi.

Defendants.  Additionally, the court granted Asahi's motion for summary adjudication of Actelion's claim of limitation of damage liability under terms of the License Agreement precluding "special, exemplary, consequential or punitive damages," finding those terms unenforceable under either Japanese or California law with respect to intentional or grossly negligent conduct.

Defendants moved to summarily adjudicate Claim 1.  The motion was denied.[10]

The Trial

In January 2011, the matter proceeded to jury trial against the Defendants on Claim 1 (intentional interference with the License Agreement), Claim 2 (wrongful interference with Asahi's prospective economic advantage in the "continued development of Fasudil"), Claim 3 (breach of a confidentiality agreement between Actelion and CoTherix on a third-party beneficiary theory), and Claim 8 (breach of confidence).  On April 29, the jury returned a unanimous liability verdict against the Defendants, awarding $358,950,000 for lost M&R payments; $187,400,000 for lost development costs; $450,000 for regulatory maintenance costs; and $75,000 for the cost of an investigator-sponsored study.  The compensatory damage award on Claim 1 totaled $546,875,000.  No damages were awarded on Claim 2, and only nominal damages were awarded on Claims 3 and 8.  The jury also unanimously found the Defendants acted with "malice, oppression or fraud."

In the punitive damage phase of trial, the jury awarded damages against the Individual Defendants only:  Jean-Paul, $19.9 million; Martine, $8.9 million; and Simon, $1.2 million.  Judgment was entered on the verdicts on Claims 1, 3, and 8 on August 18, 2011.[11]

---

[10] The trial court granted summary adjudication as to Claim 2, limiting its scope to exclude any claims for prospective economic relationships with third parties.  Claims 5 and 7 were disposed of by summary adjudication, and Claim 6 was voluntarily dismissed.  Claim 4, pled in the alternative to Claims 1 and 2, apparently was not pursued at trial.  No claims against CoTherix remained by the time the case went to trial.

[11] The court did not enter judgment on the claims on which no damages were awarded—Claim 2 and the punitive damage claim against Actelion.  (See *Costerisan v.*

Posttrial Motions

The court granted Defendants' motion to offset the damages award by the amount Asahi recovered from CoTherix in the ICC Arbitration. The court reduced the $358,950,000 in milestone and royalty (M&R) damages by $1 million, and the $187,400,000 damage verdict for development costs by $69,350,000. Actelion then filed a motion for new trial and/or remittitur and a motion for judgment notwithstanding the verdict. The Individual Defendants filed separate new trial and judgment notwithstanding the verdict motions that joined in the Actelion motions and also challenged the awards of punitive damages. Asahi moved for a new trial on punitive damages as to the Actelion entities.

The court conditionally granted the Defendants' motions for new trial, limited to the issue of compensatory damages for Claim 1, on the basis that the damages were excessive because they included duplicative damages for both lost profits and development costs. The court alternatively denied the motions, conditioned on Asahi's acceptance of a remittitur of development cost damages on Claim 1 to the amount of $18,850,000 (plus prejudgment interest). The court otherwise found the amount of damages awarded for lost M&R payments to be "proper, fair, reasonable, appropriate, and supported by the weight of the evidence." The court rejected the arguments based on alleged juror misconduct, striking juror declarations submitted by Defendants. In all other respects, the motions for new trial and judgment notwithstanding the verdict were denied, as was Ashai's motion for new trial.

Asahi accepted the remittitur. The court consequently entered an order denying the motion for new trial. The combined effect of the earlier ordered offset and the remittitur resulted in a reduction of the compensatory damages on Claim 1 to the amount of $377,325,000. An amended final judgment reflecting the reductions and inclusive of costs was entered on November 18, 2011.

---

*Melendy* (1967) 255 Cal.App.2d 57, 59–61 [in action for damages where jury is properly instructed on nominal damages, liability judgment will not be entered where jury awarded no damages].)

*The Appeals*

Defendants filed timely notices of appeal on December 2, 2011. Asahi filed its notice of cross-appeal on December 12, 2011. Actelion contends that, as a matter of law, it cannot be liable for interference with the License Agreement; that the damages awarded are inherently uncertain and speculative; and that multiple evidentiary and instructional errors mandate a new trial. The Individual Defendants join in Actelion's argument that liability for interference with contract is precluded as a matter of law, and specifically argue it was precluded as to them. They also argue that the punitive damages awarded are excessive, and that there is insufficient evidence to support imposition of punitive damages in any event. Asahi, on cross-appeal, argues that the trial court erred in remitting damages and that it is entitled to a new punitive damage trial against Actelion.

## II.    DISCUSSION

A.    *Tortious Interference with the License Agreement*

"To recover in tort for intentional interference with the performance of a contract, a plaintiff must prove: (1) a valid contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.] In this way, the 'expectation that the parties will honor the terms of the contract is protected against officious intermeddlers.' [Citation.]" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, fn. 5 (*Applied Equipment*).)

Citing *Applied Equipment*, Actelion contends that it cannot be liable for tortious interference with the License Agreement because "[t]he tort duty not to interfere with [a] contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment, supra,* 7 Cal.4th at p. 514.) Specifically, they argue: "As a matter of law, [the underlying policy of the tort of intentional interference with contract—preventing outsiders who have no legitimate social or economic interest in the contract from interfering with the expectations of contracting parties—]precludes imposition of liability against Actelion for terminating

development of [F]asudil, because that act took place after consummation of the [a]cquisition [of CoTherix], at which time Actelion was not a stranger to CoTheri[x]'s agreement with Asahi."  The Individual Defendants join in this argument and maintain: "By the same token, the [I]ndividual [D]efendants—as high-level executives of Actelion—were not strangers to the [License] Agreement, but instead were responsible for determining how Actelion, standing in the shoes of CoTherix, would deal with that agreement."

Asahi counters that California law nevertheless recognizes that corporate owners, officers and directors may be liable for interfering with corporate contracts, and that claims of privilege or justification are defenses that must be pleaded and proved.  And to prevail on such defenses, defendants must show that they did not "use improper means." (*Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 351, fn. 7, & 353, fn. 8 (*Woods*).)

       1.     *Jury Instructions on Wrongful Interference with the License Agreement*

The jury was instructed on the elements of a cause of action for wrongful interference with contract.  The court declined to give a special jury instruction, proposed by Actelion, that would have directed that the jury could not hold Actelion liable for inducing CoTherix to breach the License Agreement after the acquisition on January 9, 2007, because at that time Actelion had a direct interest in the contractual relationship between CoTherix and Asahi.

In refusing the proposed instruction, on Asahi's objection, the trial court explained:  "That's what you're going to argue.  You want to argue that they became an affiliate, therefore, they became a party to the contract.  That's argument.  And that's argument specific as to the facts. [¶] . . . [¶] The issue of law that pertains is a party cannot be held liable for interfering with their own contract.  That's the law and that is something that I would be receptive [to] that is a neutral presentation."  Actelion's counsel responded:  "[T]he only thing that I would ask to add to that is the law also says that a party cannot be liable for interference with its own contract or a contract of one of

its affiliates." The court refused the request, stating: "[Y]ou have no case that says that."[12]

Accordingly, the jury was instructed: "A person cannot be liable for interference with that person's own contract, if that person was a party to the contract at the time of the interference." And, the trial court instructed the jury on the justification defense: "In certain situations, a particular Defendant may be justified to interfere with or disrupt the contract between Asahi and CoTherix. In those situations, the law will not hold the particular Defendant liable for his/her/its actions even though Asahi suffered damages as a result of the particular Defendant's interference. [¶] It is not Asahi's obligation in this case to prove that the particular Defendant's conduct was unjustified. Instead, the particular Defendant has the burden of proving to you that his/her/its conduct was justified under the circumstances. [¶] . . . [¶] . . . [Y]ou must decide whether a particular Defendant's conduct was justified. If you find that a particular Defendant's conduct was justified, then you cannot find that the particular Defendant intentionally interfered with the [License Agreement]. [¶] In making this decision you must, as a general matter, balance the importance of the objective that the particular Defendant sought to achieve by the interference against the importance of Asahi's interest with which the particular Defendant interfered. You must keep in mind both the nature of the particular Defendant's conduct and the relationship of all the parties involved. [¶] *The affirmative defense of justification does not apply if the particular Defendant used unlawful means to interfere with the* [*License Agreement*]*. 'Unlawful means' includes intentional misrepresentation, concealment, and extortion.* [¶] . . . [¶] In evaluating whether a

---

[12] After the verdict, Defendants continued to insist, by motion for judgment notwithstanding the verdict, that they were not liable as a matter of law for any interference occurring after the acquisition. During argument on the motions, Actelion's trial counsel acknowledged: "I'm not saying we have a case in California that's directly on point. What I'm saying is that the totality of [the case law] create[s] a premise, if you will, that this kind of liability can't exist. . . . *Applied Equipment* cautions against expanding this tort too much." The trial court denied the motion for judgment notwithstanding the verdict.

particular Defendant's interference was justified, you should consider all of the circumstances, including but not limited to the following factors: [¶] 1. The nature of the particular Defendant's conduct; [¶] 2. The particular Defendant's motive; [¶] 3. The interests of Asahi with which the particular Defendant's conduct interfered; [¶] 4. The interests sought to be advanced by the particular Defendant; [¶] 5. The social interests in protecting the freedom of action of the particular Defendant and the contractual interests of Asahi; [¶] 6. The proximity or remoteness of the particular Defendant's conduct to the interference; and [¶] 7. The relations among Asahi, CoTherix, and the particular Defendant." (Italics added.)

Thus, the jury was instructed that a defendant was not liable for intentional interference with contract if that defendant's conduct was justified, but that "[t]he affirmative defense of justification does not apply if the particular Defendant used unlawful means to interfere with the [License Agreement] . . . . 'Unlawful means' includes intentional misrepresentation, concealment, and extortion."[13]  Having been so instructed, the jury nonetheless found that all Defendants intentionally interfered with the License Agreement.

2.      *Standard of Review*

We review Defendants' legal challenge to the jury instructions de novo. (*California Correctional Peace Officers Assn. v. State of California* (2010) 189 Cal.App.4th 849, 856; *Cristler v. Express Messenger Systems, Inc*. (2009) 171 Cal.App.4th 72, 82 ["propriety of jury instructions is a question of law that we review de novo"]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

3.      *Analysis*

Defendants contend that, after January 9, 2007, they could not be liable for interfering with the License Agreement because "Actelion had a 'legitimate . . . economic

_____

[13] The jury was also instructed on intentional misrepresentation, concealment, and extortion.

interest in the contractual relationship.' " Similar language is found in *Applied Equipment, supra,* 7 Cal.4th 503, in which the California Supreme Court held that *a contracting party* cannot be held liable in tort for conspiracy to interfere with its own contract. (*Id.* at pp. 507–508.) The court noted that a line of authority from the Court of Appeal had held that "one contracting party, by use of a conspiracy theory, could impose liability on another for the tort of interference with contract." (*Id.* at p. 510.) However, the Supreme Court rejected this authority "because: (1) it illogically expands the doctrine of civil conspiracy by imposing tort liability for an alleged wrong—interference with a contract—that the purported tortfeasor is legally incapable of committing; and (2) it obliterates vital and established distinctions between contract and tort theories of liability by effectively allowing the recovery of tort damages for an ordinary breach of contract. . . . [¶] . . . [¶] By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Id.* at pp. 510–511.) The *Applied Equipment* court pointed out that "Applied's conspiracy theory is fundamentally irreconcilable with the law of conspiracy and the tort of interference with contract" because "the tort cause of action for interference with contract does not lie against a party to the contract." (*Id.* at p. 514.) It further stated: "California recognizes a cause of action against *noncontracting parties* who interfere with the performance of a contract. 'It has long been held that a *stranger to a contract* may be liable in tort for intentionally interfering with the performance of the contract.' [Citation.] [¶] . . . [¶] . . . *The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.*" (*Id.* at pp. 513–514, final italics added & fn. omitted.)

Defendants do not contend that they were parties to the License Agreement after January 9, 2007. In fact, Actelion admitted in its trial court pleadings that "no contract exist[ed]" between it and Asahi and that Actelion "did not assume the contract between [Asahi] and CoTherix." Instead, Actelion contends that *Applied Equipment* should be read broadly so as to limit liability for intentional interference to complete "strangers" to

the contract, not simply nonparties to the contract. Thus, it contends that the fact that there was never any contract between it and Asahi, and that it did not assume the contract between CoTherix and Asahi, is not determinative. It concedes that, after the acquisition, it was merely a parent who "directed its *wholly-owned* subsidiary [CoTherix] to stop performing a contract." However, it contends that the only remedy for such an act is breach of contract—a remedy which Asahi has been already afforded against CoTherix in the ICC Arbitration.[14]

Defendants urge this court to take the *Applied Equipment* court's language regarding "outsiders who have no legitimate social or economic interest in the contractual relationship" out of context and read it to mean a noncontracting party who also has no interest in the contract. But the California courts have not recognized a corporate owner's absolute privilege to interfere with its subsidiary's contract. (*Woods, supra,* 129 Cal.App.4th at pp. 353, 355; *Collins v. Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 883 [whether corporation owners are "privileged to cause the corporation to discontinue its relations with plaintiffs, in the belief that such a course of action was in the best

---

[14] Defendants also rely on this court's opinion in *Asahi I*, *supra*, 204 Cal.App.4th 1. They contend: "*Asahi I* establishes that after Actelion acquired CoTherix it was not a stranger to the License Agreement with Asahi, but instead shared 'an inherent unity of economic interest and purpose' with CoTherix . . . . *Asahi I* further establishes that Actelion could not be liable for interfering with the License Agreement in the weeks preceding the Acquisition, because it was the termination of the development of [F]asudil after the Acquisition that gave rise to the damages that Asahi was awarded and 'Asahi fails to suggest how it could have successfully enjoined the merger.' " In *Asahi I*, this court held that, when a company lawfully acquires a competitor, the activities of the two companies in anticipation of the merger cannot constitute a conspiracy in restraint of trade under California's antitrust statutes. (*Id.* at pp. 3–4.) This holding is not relevant to the claims raised on the current appeal. Opinions are not authority for propositions not considered. (*People v. Avila* (2006) 38 Cal.4th 491, 566.) And, contrary to Actelion's suggestion, *Asahi I* is certainly not law of the case as to whether Actelion can be liable for tortious interference with contract. (*Moore v. Trott* (1912) 162 Cal. 268, 273 [doctrine of law of the case does not embrace "points of law not presented and determined"]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309 [doctrine of law of the case "does not apply to points of law that might have been determined, but were not decided in the prior appeal"].)

interests of the corporation, is a matter of defense, to be decided by a resolution of the factual issues presumptively involved"]; *Sade Shoe Co. v. Oschin & Snyder* (1984) 162 Cal.App.3d 1174, 1181 [an actor with " 'a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor [¶] (a) does not employ improper means, and [¶] (b) acts to protect his interest from being prejudiced by the relation' "]; *Culcal Stylco, Inc. v. Vornado, Inc.* (1972) 26 Cal.App.3d 879, 882–883 [being a parent corporation of a subsidiary business does not "without more," make "intentional interference with a contract of the business privileged as a matter of law—that is, privileged 'under all conceivable circumstances' "]; *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 600 [court could not "say, as a matter of law, that, by virtue of Caspers' position as majority stockholder and director, his interference with the business relationships of the Bank would be, under all conceivable circumstances, privileged"].)

In *Woods, supra,* 129 Cal.App.4th 344, two employees of a joint venture (Fox Family) sued Fox Family's majority shareholder for interference with a stock option contract the employees had with Fox Family. The defendant demurred on the basis that it was not a stranger to the contract, in light of its majority stake. The trial court agreed, but Division Eight of the Second District Court of Appeal reversed. (*Id.* at pp. 347–349.)

The *Woods* court noted that *Applied Equipment* involved a party to the contract and "the court's analysis never considered the immunity of someone who was not a party to the contract." (*Woods, supra*, 129 Cal.App.4th at p. 352.) Thus, it rejected the notion that *Applied Equipment* stood for the proposition that "an ownership interest in a business entity's contract confers immunity from tort liability for interfering with the entity's contracts" and that *Applied Equipment* "can be stretched so far that it now protects a defendant who has no more than an economic interest or connection to the plaintiff's contract with some other entity." (*Id.* at p. 355.) The court concluded that the *Applied Equipment* definition of "stranger" was "dicta at best." (*Id.* at p. 352.) It further concluded: "[W]e find it highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons or entities with an ownership interest in a

corporation are automatically immune from liability for interfering with their corporation's contractual obligations. [Citations.]" (*Id.* at p. 353.)

The *Woods* court also explained, in a footnote, that although the defendant was not immune, it could assert a privilege against liability for interference with contract. It explained: "The existence of that privilege depends on whether the defendant used improper means and acted to protect the best interests of his own company. [Citation.] It is a qualified privilege that turns on the defendant's state of mind, the circumstances of the case, and the defendant's immediate purpose when inducing a breach of contract. [Citation.]" (*Woods, supra*, 129 Cal.App.4th at p. 351, fn. 7.) However, because the privilege is a defense, it was not amenable to determination on demurrer. (*Ibid.*) The court summarized: "[S]ince long before *Applied Equipment* was decided, our courts have allowed contract interference claims to be stated against owners, officers, and directors of the company whose contract was the subject of the litigation. While those defendants may attempt to prove that their conduct was privileged or justified, that is a defense which must be pleaded and proved." (*Woods, supra,* 129 Cal.App.4th at p. 356.)

We agree with the *Woods* court that "[a] stranger," as used in *Applied Equipment*, means one who is not a party to the contract or an agent of a party to the contract. (*Woods, supra,* 129 Cal.App.4th at p. 353; accord, *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1604 (*Mintz*) ["settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract' "].) Under *Woods*, Actelion, by virtue of its ownership interest, is not automatically immune from tortious interference with the License Agreement. (*Woods,* at pp. 353, 355.)

Defendants misplace their reliance on *Mintz, supra,* 172 Cal.App.4th 1594. In *Mintz*, CALPERS contracted to provide health insurance to Mintz. Blue Cross contracted with CALPERS to serve as the claims administrator for the plan. Mintz sued Blue Cross for tortious interference with the contract between himself and CALPERS. The trial court sustained Blue Cross's demurrer, and Division Eight of the Second District Court of Appeal affirmed. (*Id.* at pp. 1598–1603.) The court found that Blue Cross was "an agent

for CALPERS in administering the contract of insurance." (*Id.* at p. 1603.) It also concluded that a "representative of a contracting party may not be held liable for the tort of interfering with its principal's contract . . . ." (*Id.* at p. 1607.) The *Mintz* court distinguished *Woods* by saying: "*Woods* pointed out that in *Applied Equipment* and all the decisions it cited, 'it was clear that the defendant was either a contracting party *or its agent* who could not be liable for interference' rather than 'noncontracting parties who had some general economic interest or other stake in the contract. [Citation.] In short, *Woods* merely concludes that a shareholder is not automatically immune from liability for interfering with the contractual obligations for which it holds shares [citation]; *Woods* does not stand for the proposition that the agent of a contracting party may be liable for interference with its principal's contract." (*Id.* at p. 1604, fn. 3.)

*Mintz* is distinguishable from this case in that the party charged with interference was specifically authorized to act as agent of a party to the contract. (*Mintz, supra,* 172 Cal.App.4th at p. 1603.) Defendants point to no evidence in the record establishing that Actelion was authorized to act as CoTherix's agent with respect to the License Agreement.

Nor are we persuaded by Defendants' reliance on *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242 (*Kasparian*). In that case, the plaintiff, a limited partner of a partnership, sued the general partnership, two of the individual partners, and a Los Angeles County supervisor for interfering in settlement negotiations in which the plaintiff hoped the general partnership would buy out his interest. The plaintiff obtained a judgment against the partnership and two individual partners for conspiracy to intentionally interfere with his prospective economic advantage. (*Id.* at pp. 248, 249, 251, 258.) The *Kasparian* court followed *Applied Equipment* and extended its holding to the tort of interference with prospective economic relations. The court concluded that the partnership could not be held liable, as a matter of law, for such a tort because "[i]t can only be asserted against a stranger to the relationship." (*Kasparian,* at p. 262, italics omitted; *id.* at pp. 248, 266.) However, without any discussion, the court also included the individual partner defendants within that holding. (*Id.* at pp. 262, 266.) To the extent

*Kasparian* implicitly holds that the owners of a business entity are automatically deemed to be exempt from interference liability because their economic interest means they are not "strangers," we disagree. Instead, we agree with the *Woods* court that the *Kasparian* court's absence of analysis limits the persuasiveness of its holding. (*Woods, supra,* 129 Cal.App.4th at p. 354.)[15]

We hold that the jury was properly instructed on the elements of wrongful interference with contract and properly charged with considering whether Defendants "used unlawful means to interfere with the [License Agreement]." So instructed, the jury found that each of the Defendants intentionally interfered with the License Agreement. The trial court did not err in refusing Defendants' proposed special jury instruction or in denying Defendants' motion for judgment notwithstanding the verdict.[16]

---

[15] The Individual Defendants point us to *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55 (*PM Group*). In *PM Group,* Division Three of the Second District held that certain noncontracting parties were not strangers to the contract when their performance was necessary to the plaintiffs' prospective economic relationship. A plaintiff concert promoter (Pollack) had attempted to contract with Rod Stewart for a concert tour. Pollack also entered into subcontracts with third party subpromoters. But, Stewart never signed a final contract with Pollack. Pollack then sued Stewart and Stewart's manager, lawyer, and agent for tortious interference with the subcontracts. (*Id.* at pp. 57–61.) Because the subcontracts provided for Rod Stewart's concert performance, the court concluded: "as a matter of law, Stewart and his agents could not have interfered with the performance of these subcontracts. The tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.' (*Applied Equipment*[, *supra,* 7 Cal.4th at p.] 514.) Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract. [Citations.] Because the subcontracts at issue here provided for Stewart's performance, neither Stewart nor his agents can be liable for the tort of interfering with the subcontracts." (*PM Group,* at p. 65.) *PM Group* does not assist either Actelion or the Individual Defendants. Unlike in *PM Group,* Defendants' performance was neither contemplated nor necessary to the License Agreement.

[16] Given our resolution of Actelion's postacquisition argument, we need not consider Actelion's additional argument that, as a matter of law, it cannot be liable for interfering with the License Agreement before the acquisition closed. Actelion argues: "Asahi does not explain how Actelion's alleged pre-[a]cquisition decision could amount

4.      *Liability of the Individual Defendants*

The Individual Defendants argue that, even if Actelion is liable for tortious interference with contract, the judgment against them must nonetheless be reversed. They contend: "[T]here is no dispute that the [I]ndividual [D]efendants at all times were acting within the scope of their employment for the benefit of their employer. They are not alleged to have engaged in any ultra vires conduct that interfered with Asahi's contract with CoTherix. Accordingly, regardless of whether the intentional-interference judgment against Actelion is sustainable, the three [I]ndividual [D]efendants cannot be personally liable . . . for an economic tort." (Italics omitted.)

It is true that "corporate directors cannot be held vicariously liable for the corporation's torts *in which they do not participate*. . . . '[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented . . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.' [Citation.]" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503–504, italics omitted & added (*Frances T.*).) But "[c]orporate director or officer status [does not] immunize[] a person from personal liability for tortious conduct . . . . [¶] . . . [¶] A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts. . . . [¶] The legal fiction of the corporation as an independent entity was never intended to insulate officers and directors from liability for their own tortious conduct. . . . All persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered. [Citations.]" (*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1379–1381.) "Shareholders, officers, and directors of corporations have [also] been held

---

to intentional interference with the [License] Agreement but for Actelion's actual post-[a]cquisition termination of CoTherix's development of [F]asudil, which, as just shown, cannot support liability. . . . [S]uch a decision could not cause any harm unless and until it was carried out." (Boldface & italics omitted.)

personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." (*Id.* at pp. 1387–1388.) Here, the Individual Defendants do not dispute their status as "officers" or "directors" of Actelion, and substantial evidence was presented that each actively participated in the tortious conduct.

The Individual Defendants also appear to rely on the following statement from *Self-Insurers' Security Fund v. ESIS, Inc.* (1988) 204 Cal.App.3d 1148, 1162: "[T]wo traditional limits on a corporate officer's personal liability *for negligence* . . . namely, (1) 'the oft-stated disinclination to hold an agent personally liable for economic losses when, in the ordinary course of his duties to his own corporation, the agent incidentally harms the pecuniary interests of a third party' [citation]; and (2) 'the traditional rule that directors are not personally liable to third persons *for negligence* amounting merely to a breach of duty the officer owes to the corporation alone.' [Citation.]" (Italics added, quoting *Frances T., supra,* 42 Cal.3d at p. 505.) But as made clear by the *Frances T.* court, such a rule regarding economic losses relates only to a "corporate officer's or director's personal liability *for negligence*." (*Frances T.,* at p. 505, italics added.) The Individual Defendants entirely fail to explain what these negligence principles have to do with their liability for an intentional tort.

Additionally, the Individual Defendants rely on cases involving the so-called manager's privilege. "[The manager's] privilege has been described by one court this way: 'The privilege to induce an otherwise apparently tortious breach of contract is extended by law to further certain social interests deemed of sufficient importance to merit protection from liability. Thus, a manager or agent may, *with impersonal or disinterested motive*, properly endeavor to protect the interests of his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests.' [Citations.]" (*Aalgaard v. Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 684.) It is also "settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract.' [Citation.]" (*Mintz, supra,* 172 Cal.App.4th at p. 1604.) The Individual Defendants contend: "In refusing to recognize that the

manager's privilege applied to the [I]ndividual [D]efendants after Actelion acquired CoTherix, the superior court committed an error of law."

These cases do not assist the Individual Defendants because Actelion admitted that "no contract exist[ed]" between it and Asahi and that Actelion "did not assume the contract between [Asahi] and CoTherix." The trial court properly granted Asahi's motion for summary adjudication, concluding that the manager's privilege did not apply to the Individual Defendants because none were managers *of CoTherix* or authorized to act on *CoTherix's* behalf, and none of the Actelion entities are parties to the License Agreement. The Individual Defendants assert that, in granting summary adjudication on the manager's privilege defense, the trial court focused on the wrong question. They contend that, pursuant to their broad reading of *Applied Equipment*, "for purposes of liability for Actelion's post-acquisition termination of CoTherix's development of [F]asudil, the question is whether the individual defendants were managers of Actelion, not whether they were managers of CoTherix." But, we have already rejected that broad reading of *Applied Equipment*. And, under the manager's privilege, a company's manager may not be liable to a third party for inducing *his or her* company to breach *its* contract with the third party. (*Klein v. Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 80.) The manager's privilege does not exempt a manager from liability when he or she tortiously interferes with a contract or relationship between third parties. (*Ibid.*)

B.    *Instructional and Evidentiary Issues*

Actelion contends that a new trial is warranted because the trial court "all but guaranteed that the jury would return a massive verdict against [it]" by virtue of the trial court's "one-sided evidentiary rulings and a breathtakingly prejudicial jury instruction." Specifically, Actelion complains that the trial court made several errors: (1) instructing the jury on discovery misconduct committed by Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd.; (2) excluding evidence regarding Asahi's ongoing Phase IIa study of Fasudil in Japan; (3) admitting testimony from Asahi expert witness Zhi-Cheng Jing, M.D., regarding a Fasudil study in China; (4) excluding evidence of reasons other companies declined to license Fasudil; (5) limiting cross-examination of

Asahi's expert witness on damages, Gordon Rausser, Ph.D.; and (6) excluding a 2007 email authored by an Asahi licensing manager.

To prevail on these arguments, Actelion must carry a heavy burden. "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Furthermore, "[t]he trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred. [Citations.]" (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; accord, Cal. Const., art. VI, § 13.)

1.     *Jury Instruction on Discovery Misconduct*

First, Actelion argues that the trial court abused its discretion in giving jury instruction No. 14 as a discovery sanction. "Discovery sanctions must be tailored in order to remedy the offending party's discovery abuse, should not give the aggrieved party more than what it is entitled to, and should not be used to punish the offending party. [Appellate courts] review the trial court's order under the deferential abuse of discretion standard. [Citation.]" (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1217, fn. omitted.) " 'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action. [Citation.]' " (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36, superseded by statute on another ground, as stated in *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1595.)

a.     *Background*

In October 2010, Asahi learned that the FDA had posted a warning letter on its Web site concerning Actelion Pharmaceuticals US, Inc.'s and Actelion Pharmaceuticals Ltd.'s reporting of the deaths of more than 3,400 Tracleer patients. The warning letter, dated September 14, 2010, provides: "The [FDA] inspected Actelion Pharmaceutical's

. . . facility located [in South San Francisco] from June 24 through July 20, 2009. . . . [The] FDA's inspection found that your firm failed to comply with the postmarketing reporting requirements imposed under 21 U.S.C. § 355(k) . . . and its corresponding regulations . . . . [¶] . . . [¶] In prelude to our discussion of these deviations, we acknowledge that Tracleer® and Ventavis® are indicated for the treatment of a serious condition that often results in patient death. In issuing this letter we are not concluding or implying that the patient deaths that were not properly reported to FDA in connection with these drugs would ultimately be determined to have been caused by their use, or that further information might not have provided an adequate basis under the regulations for not reporting them. . . . [¶] . . . Actelion's written procedures . . . do not require the reporting of deaths to FDA within 15 calendar days of Actelion's receipt of information about their occurrence when there is a reasonable possibility that the drug caused the death. Specifically, when Actelion has no information at all about the relationship between a death and its drug product, Actelion presumes that there is no relationship between the two and does not report the death to the FDA on an expedited basis." (Fn. omitted.) Because the warning letter was sent after the close of discovery, there was no dispute about its production during discovery. However, the posting of the warning letter highlighted for Asahi (and the trial court) that Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. had failed to produce at least some previously-requested documents.

Asahi moved for sanctions, pursuant to Code of Civil Procedure section 2023.030, including, but not limited to, the following: (1) striking defendants' safety defenses; (2) precluding Actelion's use of any document produced after the discovery cutoff; (3) instructing the jury on Actelion's discovery conduct; (4) preventing defendants from relying on certain evidence; and (5) monetary sanctions. In its amended motion, Asahi argued: "Asahi has been denied the opportunity to conduct pretrial discovery with these documents, authenticate them, ask witnesses about them, use them with Asahi's (and Defendants') experts, or even have a meaningful opportunity to review them. . . . [¶] Postponing the trial is not a viable option—that is precisely what Defendants have

been seeking since this case was initiated, and they should not receive the ultimate reward for their willful discovery failures. Instead, given that the Actelion Defendants have robbed Asahi of the opportunity to make complete, meaningful comparisons between the Actelion Defendants' safety allegations about [F]asudil and the safety of other drugs developed and in development by the Actelion Defendants . . . the only fair thing would be to preclude the Actelion Defendants from pursuing their fabricated, blame-the-victim strategy of impugning [F]asudil's safety at trial altogether."

Actelion opposed the sanctions motion on the grounds that it had produced, in July 2010, two electronic files which repeated verbatim the FDA's investigational findings. Actelion explained the delayed production of the remaining responsive documents by stating that Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. originally searched only product-specific documents, which are maintained in a central regulatory file in New Jersey, whereas the FDA inspection related to nonproduct-specific reporting procedures and such documents are maintained in the South San Francisco office. Actelion also argued that any prejudice could be cured by a continuance of the trial date and reopening of discovery. According to Actelion, more serious sanctions would improperly place Asahi in a better position at trial than if there had been no discovery violation.

The trial court ruled: "The Court finds that there was a willful suppression of evidence by Defendants Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. (not the other two Actelion entities), specifically regarding the 2009 FDA inspection and investigation regarding the reporting of deaths of patients while taking [T]racleer/bosentan, and the related subsequent communications with the FDA—which ultimately culminated in the public Warning Letter issued by the FDA dated September 14, 2010, which brought this failure to produce evidence to light to [Asahi] and the Court. . . . [¶] . . . [¶] . . . Defendants Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. had in their possession—and have subsequently produced after this Court's hearing on November 10, 2010—a multitude of communications to and from the FDA regarding Tracleer and the postmarketing reporting of deaths, as well as a multitude

of emails and other internal communications in this regard. Many of these are dated 2009. [¶] . . . These documents are within the scope of [Asahi's] requests for production of documents propounded to the Actelion entity Defendants during 2009. . . . Defendants objected to these requests, and a motion to compel was filed. Documents responsive to these particular requests for production were ordered produced by the Actelion Defendants to Plaintiff by this Court's Order on Plaintiff's Motion to Compel Further Responses to Requests for Production of Documents and Further Answers to Special Interrogatories, filed June 8, 2010. Those documents were required, by that Order, to be produced no later than 30 days from service of the Order. This [did] not occur. [¶] . . . [¶] . . . Defense counsel asserts that the Defendants searched the 'central repositories where safety and regulatory information are kept,' which is a building in New Jersey, in response to this Court's June 8th Order. But Defendants themselves knew better. (There is no indication of any improper conduct of Defendants' counsel.) [¶] . . . The Declaration of . . . Duffy-Warren, filed November 5, 2010, . . . tells what was done to search. She states that she is the 'primary point of contact between the FDA's drug review division and Actelion.' She states the variety [of] FDA applications and reports collected, including communications with the FDA. She states that these documents about the FDA investigation during 2009 were not located in New Jersey, but rather were located at the office in South San Francisco. 'It did not occur to' Duffy-Warren to look there. [¶] . . . Yet, the internal documents now produced in November 2010—one year after originally requested, and almost six months after ordered to be produced—reflect that Dr. Duffy-Warren (a PhD) was personally aware of the FDA investigation and the internal discussions about response to the FDA's concerns occurring during 2009. . . . Further, the FDA inspection and investigation, of which she knew, was regarding the U.S. headquarters in South San Francisco and there was every reason to look for the documents there—or realize that the documents were not disclosed as part of the New Jersey search." (Boldface & italics omitted.) The court granted Asahi's request for a jury instruction and otherwise denied the request for sanctions.

Consistent with the trial court's order, the jury received the following instruction at the close of evidence: "Documents were requested by [Asahi] during pretrial discovery, which requests would have included any documents regarding an FDA inspection and investigation occurring during 2009, and internal documents of Actelion Pharmaceuticals, Ltd. and Actelion Pharmaceuticals US, Inc. regarding those FDA communications, which communications did specifically pertain to reporting of deaths of patients while taking Tracleer/bosentan, and ultimately resulting in the issuance of a Warning Letter by the FDA dated September 14, 2010 . . . . Defendants Actelion Pharmaceuticals, Ltd. and Actelion Pharmaceuticals US, Inc. were ordered by the Court to produce the documents responsive to Asahi's document requests, but these documents were not timely produced by Defendants Actelion Pharmaceuticals, Ltd. and Actelion Pharmaceuticals US, Inc. until after the deadline for discovery and months after the Court's Order requiring production, at a time shortly before trial. The withholding of these documents by Actelion Pharmaceuticals Ltd. and Actelion Pharmaceuticals US, Inc. until after the discovery cut-off prevented Asahi from taking depositions regarding these documents and from certain other pretrial discovery that Asahi would have otherwise conducted in preparation for trial."

In their closing argument, Asahi argued: "The FDA warning letter . . . this was put in at the end of our case. Remember, we had to bring it in. It was wrapped up in a bow from the FDA. And Dr. Jim White explained to you the importance of that FDA warning letter, that Actelion Pharmaceuticals U.S. had been improperly reporting the deaths of over 3500 patients on Tracleer to the FDA. And did you hear a word, did you hear a peep about why that happened from the defendants? And the reason this is important is because remember the defendants' defense. They say we are a safety-conscious company. We are a company that cares about patients and that's why we couldn't develop [F]asudil. [¶] Is this a safety-conscious company? And have they ever explained that to you? They haven't." [17]

---

[17] Defendants did not object to Asahi's argument.

b.    *Analysis*

"Misuse of the discovery process may result in the imposition of a variety of sanctions.  These include payment of costs, sanctions barring the introduction of certain evidence, sanctions deeming that certain issues are determined against the offending party, and sanctions terminating an action in favor of the aggrieved party.  (Code Civ. Proc., §§ 2023.020, 2023.030.)  Misuse of the discovery process includes failing to respond or submit to authorized discovery, providing evasive discovery responses, disobeying a court order to provide discovery, unsuccessfully making or opposing discovery motions without substantial justification, and failing to meet and confer in good faith to resolve a discovery dispute when required by statute to do so.  (Code Civ. Proc., § 2023.010, subds. (d)–(i).)  The court may impose sanctions '[t]o the extent authorized by the chapter governing any particular discovery method or any other provision of this title . . . .'  (Code Civ. Proc., § 2023.030.)"  (*Karlsson v. Ford Motor Co., supra,* 140 Cal.App.4th at p. 1214.)

Actelion challenges the trial court's finding that "there was a willful suppression of evidence."  It contends that conclusion is "flatly wrong" because Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. did produce two documents referencing the FDA inspection before the close of discovery.  The trial court, however, did not find that Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. had willfully suppressed *all* evidence of the FDA investigation.  Rather, the court found that by delaying production of some, if not most, of the documents regarding the FDA investigation until discovery had closed (especially internal communications regarding the investigation) Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. suppressed evidence Asahi was entitled to receive.  As a result, Asahi was effectively foreclosed from obtaining deposition testimony from the Actelion employees who authored the 2009 communications that were not produced until the fall of 2010.  It is this evidence that was suppressed.  A party's cooperation in producing some requested discovery materials does not excuse its failure to produce other items specifically

requested and required by a court order. (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 229.) The suppression finding is supported by the record.

The trial court's finding that the suppression was willful is also supported by the record. "Lack of diligence may be deemed willful in the sense that the party understood his obligation, had the ability to comply, and failed to comply. [Citation.] A willful failure does not necessarily include a wrongful intention to disobey discovery rules. A conscious or intentional failure to act, as distinguished from accidental or involuntary noncompliance, is sufficient to invoke a penalty. [Citation]" (*Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 787–788.) The trial court clearly did not accept Duffy-Warren's suggestion that Actelion Pharmaceuticals US, Inc. inadvertently failed to search its headquarters in South San Francisco, where the FDA inspection took place. This is supported by evidence of Duffy-Warren's own involvement with the FDA investigation, which she knew to be occurring in South San Francisco.

Actelion contends that the only proper remedy for the late production of documents was to continue trial and reopen discovery at Actelion's expense.[18] Actelion contends that the instruction gave Asahi an undue advantage by "creat[ing] the severely prejudicial misimpression that . . . patient deaths were caused by Tracleer . . . and that the jury therefore should not believe Actelion's defense that it is 'a company that cares about patients, and that's why [it] couldn't develop [F]asudil.' " It relies on "[t]he rule that a sanction order cannot go further than is necessary to accomplish the purpose of discovery . . . . [Citation.]" (*Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 613 [terminating sanction; defendant's answer was stricken].) It is true that "[t]he penalty should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery. . . . [T]he sanction

---

[18] Actelion also asserts that Asahi did not need additional discovery because Asahi did not introduce the belatedly produced documents at trial. But, this is precisely why Asahi needed the instruction—because Asahi was prevented, by virtue of the late production, from conducting further discovery in advance of trial. We agree with the trial court that Asahi had no obligation "to wing it at trial."

should not operate in such a fashion as to put the prevailing party in a better position than he would have had if he had obtained the discovery sought *and it had been completely favorable to his cause*. [Citations.]" (*Deyo v. Kilbourne, supra,* 84 Cal.App.3d at p. 793, italics added [defendant's answer stricken].)

We disagree with the premise of Actelion's argument. The instruction did nothing more than inform the jury of Actelion Pharmaceuticals US, Inc.'s and Actelion Pharmaceuticals Ltd.'s discovery conduct and the adverse impact this had on Asahi. It did not preclude Actelion from presenting its safety defense or invite the jury to draw any inferences regarding the cause of the Tracleer patient deaths. The redacted version of the warning letter that was received in evidence at trial and was specifically referenced in the instruction, made clear that the FDA was "not concluding or implying that the patient deaths that were not properly reported . . . would ultimately be determined to have been caused by [Tracleer] use."

The trial court considered a continuance of trial and reopening of discovery as an alternative to the sanctions that could be imposed under Code of Civil Procedure section 2033.030. " '[T]he question before this court is not whether the trial court should have imposed a lesser sanction; rather, the question is whether the trial court abused its discretion by imposing the sanction it chose. [Citation.]' " (*Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611, 1620.) Continuing trial appears to have been what Actelion sought, and thus doing so would have been no sanction at all—especially in light of what the court found to be Actelion Pharmaceuticals US, Inc.'s and Actelion Pharmaceuticals Ltd.'s clear violation of a court order.

Jury instruction No. 14, which appears to be a hybrid between an issue sanction and an adverse inference instruction based on Evidence Code section 413 and CACI No. 204,[19] was ordered as a lesser sanction to the sanctions originally sought by Asahi

_____

[19] All further section references are to the Evidence Code unless otherwise indicated. Section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in

under Code of Civil Procedure section 2023.030. (See *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1416, 1427 [jury instruction that defendant destroyed evidence after receiving notice to preserve is an issue sanction establishing those purported facts as true].) In *Karlsson v. Ford Motor Co., supra,* 140 Cal.App.4th 1202, the Second District Court of Appeal upheld the use of a similar special instruction after a discovery referee found that the defendant acted willfully in attempting to conceal evidence. (*Id.* at pp. 1224–1225.) Jury instruction No. 14 did not preclude Actelion from presenting its safety defense or invite the jury to draw any inferences regarding the cause of the Tracleer patient deaths. The trial court did not abuse its discretion. Likewise, contrary to Actelion's assertion on appeal, Asahi's argument to the jury was not inflammatory, nor did it suggest that Tracleer or Ventavis had caused the patient deaths.[20]

Finally, Actelion contends that the trial court abused its discretion in admitting evidence of the 2009 FDA investigation because it was irrelevant or unduly prejudicial. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Section 352 provides: "The court in its discretion may exclude evidence if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Italics added.) " [A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the

---

the case against him, or his willful suppression of evidence relating thereto, if such be the case." CACI No. 204 provides: "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." "Trial courts, of course, are not bound by the suggested language of the standard . . . instruction[s] and are free to adapt [them] to fit the circumstances of the case, including the egregiousness of the spoliation and the strength and nature of the inference arising from the spoliation." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12.)

[20] Moreover, Defendants' failure to object to Asahi's argument forfeited any error. (*Karlsson v. Ford Motor Co., supra,* 140 Cal.App.4th at pp. 1227, 1229.)

admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations].  Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [Citation.]'  [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

"The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

On relevance and prejudice, Actelion cites various authorities suggesting that the warning letter does not constitute a final agency action.  It also points out that it is undisputed that Actelion reported every one of the deaths at issue; the issue raised by the FDA was the timing and format of reports.  Like the trial court, we fail to see how the warning letter's status as final or nonfinal agency action has any effect on its admissibility.  The evidence was relevant because it tended to discredit Actelion's claim that it was committed to patient safety and for that reason alone decided not to further develop Fasudil.  Although the inference may have been stronger if Actelion Pharmaceuticals US, Inc. and Actelion Pharmaceuticals Ltd. had failed altogether to report the deaths of patients taking Tracleer, the fact that such reports were delayed, and made in regular quarterly reports, rather than on an expedited (15-day) basis, does not

make the evidence completely irrelevant.  As one treating physician testified, "[the warning letter] makes me much more nervous about prescribing Tracleer because I believe that I don't have all the information that . . . I need to know . . . about the safety profile of this drug."  The trial court did not abuse its discretion in determining the evidence was relevant and its probative value outweighed its potential for prejudice. (§ 352.)

### 2.    *Exclusion of Evidence Regarding Japanese Study*

Actelion also challenges the trial court's ruling on Asahi's motion in limine to exclude evidence related to the design and interim results of Asahi's ongoing Phase IIa study of ER Fasudil for PAH, in Japan.  In granting the motion, the trial court explained: "Given that this 'double blind' study has not been unblinded, any results are speculative, more prejudicial than probative, would lead to confusion, and would be an undue consumption of time."[21]  Based on our review of sealed documents in the record, we conclude the trial court's ruling was not an abuse of discretion.

### 3.    *Evidence of Chinese Study*

In a similar vein, Actelion contends that the trial court abused its discretion in admitting the testimony of Zhi-Cheng Jing, M.D., regarding the results of a 2009–2010 study, conducted in China, on intravenous Fasudil.  The appellate courts review a trial court's ruling on a motion to exclude an expert's opinion for abuse of discretion.  But, " '[d]iscretion is always delimited by the statutes governing the particular issue.' [Citation.]"  (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950.)

Jing testified, as an expert on the use of intravenous Fasudil for PAH patients, that intravenous Fasudil proved more effective than inhaled Ventavis during the Chinese study.  Jing also opined that intravenous Fasudil is safe for treating PAH patients.  The trial court overruled Actelion's objections to Jing's opinions on the ground that they were irrelevant or unduly confusing under section 352, being based on a single-dose,

---

[21] In a double-blind study, neither the patients nor the investigators know who receives the drug or the placebo.

nonplacebo-controlled study of intravenous Fasudil, rather than inhaled Fasudil or ER Fasudil.

Actelion continues to urge on appeal that "Jing's opinions on the purported efficacy of intravenous [F]asudil were unfounded and irrelevant, and it was an abuse of discretion to admit them into evidence, because those opinions were based on undocumented human experiments in China, not the double-blinded, placebo-controlled studies that the FDA and [European Medicines Agency (EMEA)] undisputedly require as a prerequisite to approval. . . . Jing's opinions about intravenous [F]asudil therefore could not assist the jury in determining whether the oral ER and inhaled formulations of [F]asudil at issue in this case would have satisfied the criteria for regulatory approval as PAH therapies in North America and Europe—the markets at issue here."

The trial court did not abuse its discretion in concluding that Jing's results had sufficient probative value. It is undisputed that the intravenous, oral, and inhaled formulations share the same active ingredient. Actelion itself repeatedly suggested to the jury that other evidence relating to intravenous Fasudil showed ER or inhaled Fasudil was unsafe and would not have been approved by the FDA as a PAH therapy. The dissimilarities between the Chinese study and the FDA's requirements for drug approval—double-blinded and placebo-controlled studies—go to the evidence's weight not its admissibility.[22]

Actelion also argues that Jing's expert testimony should have been excluded by the trial court because he did not produce all of the documentation supporting his opinions. Prior to trial, Defendants had filed a motion in limine that sought to exclude Jing's expert testimony on the grounds that Jing did not produce the data he relied on in formulating his opinion. In denying that motion, the court explained: "Defendants argue that Jing's testimony should be excluded because he reviewed and relied upon patient records that he cannot copy and turn over to the counsel for either side. Defendants first

---

[22] We are unpersuaded by Actelion's attempt, in its reply brief, to suggest that evidence regarding the *safety* of intravenous Fasudil is relevant but evidence regarding the *efficacy* of intravenous Fasudil is not.

cite . . . Section 721[23] which sets the parameters of cross-examination of expert witnesses. From this, Defendants attempt to extrapolate a requirement that an expert be excluded if there is a lack of production of some documents upon which the opinion is based. Defendants present no case law making such a holding, and the Court is unaware of any such appellate decision. . . . [¶] Second, Defendants cite to case law holding that expert opinion evidence may be excluded if based upon privileged information. Yet a review of the cases reflects that its purpose is to preserve the public policy upholding the statutory privilege itself. *Fox v. Kramer* (2000) 22 Cal.4th 531, 539 . . . . The situation presented here is not that the material which is the basis for the expert's opinion is not discoverable because it is privileged, but rather it is not discoverable because it is located in China, which does not allow the documents to leave the country. There is no showing that the materials are privileged under California law. Thus the materials are impossible to be presented by the expert witness because of governmental requirements beyond his control. Further, the information pertains to patient studies conducted or overseen by the expert witness, and thus is also in the nature of a percipient witness (which does not require disclosure prior to testifying). This witness provided a draft of his study report, with tables and information, as well as certain data spreadsheets, but not the underlying individualized patient 'case report forms' data." (Italics omitted.)

---

[23] Section 721 provides: "(a) Subject to subdivision (b), a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion. [¶] (b) If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion. [¶] (2) The publication has been admitted in evidence. [¶] (3) The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. [¶] If admitted, relevant portions of the publication may be read into evidence but may not be received as exhibits."

Code of Civil Procedure section 2034.270 provides: "If a demand for an exchange of information concerning expert trial witnesses includes a demand for production of reports and writings as described in subdivision (c) of Section 2034.210, all parties shall produce and exchange, at the place and on the date specified in the demand, all discoverable reports and writings, if any, made by any designated expert described in subdivision (b) of Section 2034.210." Furthermore, the trial court had specifically ordered: "Not less than two business days prior to the commencement of an expert deposition, the attorneys who have retained that expert shall cause to be delivered to the examining attorney's office, the documents relied upon by that expert in forming his or her opinions . . . , unless the parties agree otherwise." In noticing Jing's deposition, Defendants requested production of, among other things, "[a]ll material which the deponent considered or reviewed . . . in formulating the opinions to which the deponent will testify" and "[a]ny and all documents upon which the deponent relies in forming his or her opinions." Here, Jing produced only an abstract report of his study and an outline of his opinions. He did not produce any of the underlying case report forms, the protocol for the study, or the underlying data from his study.

Code of Civil Procedure section 2034.300 provides: "Except as provided in Section 2034.310 and in Articles 4 (commencing with Section 2034.610) and 5 (commencing with Section 2034.710), on objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court *shall* exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following: [¶] (a) List that witness as an expert under Section 2034.260. [¶] (b) Submit an expert witness declaration. [¶] (c) Produce reports and writings of expert witnesses under Section 2034.270. [¶] (d) Make that expert available for a deposition under Article 3 (commencing with Section 2034.410)." (Italics added.) A party's failure to comply with the expert discovery rules is "unreasonable" when the conduct appears to be gamesmanship. (*Boston v. Penny Lane Centers, Inc.,* *supra,* 170 Cal.App.4th at p. 952; *Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1504; *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1117.)

Jing's failure to produce all supporting material appears to have been reasonable because it was outside of his, Asahi's, or Asahi counsel's control. Asahi concedes that Jing did not produce all of the data or documents underlying his experiments but explains that this was because he was precluded by Chinese law from doing so. Asahi included Jing in its list of disclosed expert witnesses. And, Jing produced a draft of his study report, as well as an outline of his opinions, including a description of the basis therefore. Actelion had ample opportunity to further explore the basis of Jing's opinions at his deposition and was not "denied . . . a fair opportunity to defend against Asahi's claims." The trial court did not abuse its discretion in declining to exclude Jing's testimony.

Actelion misplaces its reliance on *Fox v. Kramer, supra,* 22 Cal.4th 531. In that malpractice case, the California Supreme Court upheld a trial court's exclusion of expert testimony when the investigator relied on privileged hospital peer review committee records in forming his opinions. (*Id.* at p. 534.) But *Fox v. Kramer* did not involve Code of Civil Procedure section 2034.300. Rather, the court construed section 1157, subdivision (a) of the Evidence Code, which provides that records of peer review committee investigations are immune from discovery. (*Fox v. Kramer,* at pp. 538, 540.) The court observed: "When . . . an expert has relied on privileged material to formulate an opinion, the court may exclude his testimony or report as necessary to enforce the privilege. [Citations.]" (*Id.* at p. 541.) Actelion has not demonstrated the application of any similar privilege here.

4. *Exclusion of Evidence of Declined Licenses*

Actelion next complains that the trial court erroneously excluded evidence of the reasons that other pharmaceutical companies declined to license Fasudil.

Actelion sets out the evidence the trial court permitted Asahi to admit in support of its theory that Actelion's alleged interference and disparagement caused potential licensees to reject Fasudil. Actelion then notes that, during Actelion's cross-examination of Kazuka Yokota, a manager in Asahi's licensing and business development group, the following colloquy occurred:

"Q. Let's talk about efforts to license [F]asudil in the [U.S.] and Europe. [¶] How many different companies have you talked to or had discussions with about licensing [F]asudil?

"[ASAHI'S TRIAL COUNSEL]: Objection. It's still vague as to time.

"THE COURT: It is. Are you asking for the past 25 years?

"[ACTELION'S TRIAL COUNSEL]: I'll limit it since 2001.

"[ASAHI'S TRIAL COUNSEL]: Objection, Your Honor. Relevance.

"THE COURT: Sustained.

"Q. . . . Have you talked to companies in an effort to license this drug . . . ?

"A. Yes.

"Q. How many of those companies raised renal toxicity as an issue in deciding not to license it?

"[ASAHI'S TRIAL COUNSEL]: Objection. Hearsay. Undesignated opinion.

"THE COURT: Sustained.

"Q. . . . Did any companies advise you about their concerns of renal toxicity other than Actelion?

"[ASAHI'S TRIAL COUNSEL]: Objection. Hearsay. Undesignated opinion.

"THE COURT: Sustained.

"[ACTELION'S TRIAL COUNSEL]: It's being offered not for the truth, Your Honor, but to show that they were aware that other—

"[ASAHI'S TRIAL COUNSEL]: Your Honor, may we approach for this discussion?

"THE COURT: The objection is sustained."

Yokota was also asked about licensing efforts after CoTherix's breach of the License Agreement:

"Q. . . . After Schering returned the drug, did you engage in activities to try to find other companies to license the compound?

"A. Yes.

"Q. How many different companies did you talk to in efforts to license it after Schering returned it?

"A. After I had—well, at least one company.

"Q. Okay. Did Schering try to license or sublicense the product out after it decided not to continue development?

"[ASAHI'S TRIAL COUNSEL]: Objection. Relevance.

"THE COURT: Yes. Sustained.

"Q. . . . Ms. Yokota, you testified here that the decision by Actelion, or CoTherix[,] I should say, not to move forward with development caused you, what you believed to be, some harm; is that correct?

"A. Yes.

"Q. In your 20 years' experience in working in licensing, do you find that companies are looking for drugs that they think they can make money off of?

"A. Yes.

"Q. And has any company—after the drug was returned by CoTherix, has any company agreed to license this compound?

"A. No.

"Q. And has any company with whom you've talked communicated to you that they—

"[ASAHI'S TRIAL COUNSEL]: Objection, Your Honor. Hearsay before it's revealed.

"THE COURT: Sustained.

"[ACTELION'S TRIAL COUNSEL]: What company has told you—

"[ASAHI'S TRIAL COUNSEL]: Objection, Your Honor. Same objection, hearsay.

"THE COURT: It clearly seeks to elicit a statement of a third party and the hearsay objection is sustained.

"[ACTELION'S TRIAL COUNSEL]: Your Honor, it's being offered to show notice of—they've asserted that—

"THE COURT: After the termination, it would be irrelevant. The objection is sustained.

"[ACTELION'S TRIAL COUNSEL]: To their disparagement claim, Your Honor?

"THE COURT: That's not how you phrased it, sir.

"[ACTELION'S TRIAL COUNSEL]: Well, let me try one more time.

"THE COURT: They haven't laid any foundation for you then to be responding to on the disparagement. So it's still hearsay at this time."

Similar hearsay objections were sustained during further cross-examination of Yokota and during the cross-examination of the president of Asahi, Toshio Asano, Ph.D. And Actelion made an offer of proof that highlighted several exhibits containing statements made by third-party companies regarding the reasons they declined to license Fasudil.

During a discussion of the issue outside the presence of the jury, the court explained its rulings: "If a third-party company, who is not a party to this case, who was never deposed as part of this case, who was never designated as an expert, lay or otherwise, to give expert opinion about whether or not [F]asudil is toxic, that's an undisclosed expert opinion and hearsay. That's what it is. That's the problem. I'm not having a problem on relevancy. I'm having a problem on hearsay and undisclosed expert witness opinion. That's the hurdle that I'm grappling with. [¶] . . . [¶] [I]f some third party, who was not designated as an expert in this case, who was never deposed, what—and you want to present their hearsay statement that they're not licensing it, or they're handing it back because [F]asudil is toxic, I don't see how that is relevant except for the truth of the matter; and, therefore, then we get to the truth of the matter, which is that it's hearsay and it's undisclosed expert opinion. Otherwise, it seems to have no relevance."

Actelion contends the out-of-court statements were nonhearsay. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (§ 1200, subds. (a), (b).)

Evidence of a declarant's statement is not hearsay if it " 'is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' [Citation.]" (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) But, "[a] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute. [Citations.]" (*People v. Armendariz* (1984) 37 Cal.3d 573, 585, superseded by statute on other grounds as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 255.) The excluded evidence was hearsay. The only way the excluded evidence would rebut Asahi's theories is if the out-of-court statements were admitted for their truth—that the other companies' reasons for not licensing Fasudil were truthful statements about the drug. Whether Asahi was on notice of those reasons was irrelevant to the case.[24]

Nor must the judgment be reversed because the evidence may have been admissible under the state of mind exception to the hearsay rule, as Actelion contends. Section 1250, subdivision (a), provides: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove *the declarant's* state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of *the declarant*." (Italics added.) With respect to the

---

[24] Actelion also contends that "the superior court's rulings allowed Asahi to paint a completely distorted picture of reality" and that the excluded evidence "would have directly rebutted" Asahi's contentions that Fasudil was safe and that it was "Actelion's allegedly tortious acts [that] caused Asahi's re-licensing difficulties." But Defendants were allowed to show that other pharmaceutical companies declined to license Fasudil.

*post*-2007 potential licensees, the licensees' hearsay statements of their states of mind may have been relevant to show why they declined to license Fasudil.  However, Actelion forfeited this argument by waiting to raise this basis for admission in its motion for new trial.  "An appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless '[t]he substance, purpose, and relevance of the excluded evidence was made known to the [trial] court by the questions asked, an offer of proof, or by any other means.'  (. . . § 354, subd. (a).)"  (*Fox v. Kramer, supra*, 22 Cal.4th at p. 543.)  With respect to the *pre*-2007 potential licensees, Actelion makes no attempt to explain how the conduct or state of mind was relevant.  As the trial court observed:  "In terms of pretext, it depends on what [Actelion] knew.  And if [Actelion] didn't know this and didn't rely upon it and didn't read it, then that didn't go into the mix of what it is that [Actelion] thought.  The issue is the pretext of [Actelion's] thought process and information, not what somebody else thought or did."

Finally, the evidence was not admissible under the adoptive admission exception to the hearsay rule, as Actelion contends.  Section 1221 provides:  "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, *with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth*."  (Italics added.)  Actelion has not established that Asahi did, in fact, manifest its belief in the truth of the statements of its potential licensees.  The trial court did not abuse its discretion in sustaining Asahi's hearsay objections.

5.  *Limited Cross-Examination of Rausser, Asahi's Damages Expert*

Next, Actelion points out that CoTherix's senior vice-president of corporate development, Benson Fong, described in his deposition certain parts of the October 2006 projections for possible sales of Fasudil as "crude estimates" that were "very unreliable" because they were "so far off in the future."  Actelion then maintains that the trial court erred in foreclosing it from cross-examining Rausser regarding Fong's statements.

During cross-examination by Actelion's trial counsel, Rausser testified that he had read Fong's deposition testimony. Thereafter, the following colloquy occurred on the record:

"Q. Well, when you read [Fong's] deposition and relied upon it, . . . do you recall that he specifically said that [CoTherix's revenue projections for Fasudil] were crude estimates. Remember the word, crude estimates?

"[ASAHI'S TRIAL COUNSEL]: Objection, assumes facts not in evidence.

"THE COURT: Sustained.

"[ACTELION'S TRIAL COUNSEL]: . . . You relied upon [Fong's] deposition, did you not?

"A. I reviewed a number of depositions. That does not mean I rely on them. If I don't find them credible, I don't rely on them.

"Q. I understand that. You read it?

"A. Yes.

"Q. My question to you is, sir, [Fong] in his deposition that you read, referred to [CoTherix's revenue projections for Fasudil] as crude estimates. Do you recall that?

"[ASAHI'S TRIAL COUNSEL]: Objection, mischaracterizes the evidence and assumes facts.

"[ACTELION'S TRIAL COUNSEL]: Found at page 225.

"THE COURT: Sustained on assuming facts.

"[ACTELION'S TRIAL COUNSEL]: . . . Sir, do you recall if [Fong] said, I don't know how likely they are, when you read the deposition?

"[ASAHI'S TRIAL COUNSEL]: Objection. That also calls for hearsay, your honor.

"[ACTELION'S TRIAL COUNSEL]: Can't be hearsay, he relied upon it.

"[THE COURT]: I did not hear that he relied upon it. If you want to lay that foundation.

"[ACTELION'S TRIAL COUNSEL]: . . . You read that, did you not?

"A. Yes.

"Q. And you told us at your deposition that you read it and relied upon it, did you not?

"A. May I explain?

"Q. No. My question is yes, or no.

"A. No, I did not rely on it because I did not find it credible without seeing other testimony from other officials at CoTherix. . . . I included all the materials that were reviewed. The material that was reviewed is not necessarily material that you accept the logic and arguments in that material, that's an assessment that has to be made. [¶] So I draw a separation between reviewing it, which I certainly did with regard to [Fong's] deposition, but when you say relied upon, that implies to me that I have accepted it, and I don't accept what deposition testimony is without seeing corroborating evidence.

[¶] . . . [¶]

"Q. When you read the deposition of [Fong], he said that the projections are very unreliable, because the revenue is so far off in the future. [¶] Did you read that and did you discount that?

"[ASAHI'S TRIAL COUNSEL]: Objection, mischaracterizes the evidence. Also calls for hearsay.

"THE COURT: Sustained on hearsay.

"[ACTELION'S TRIAL COUNSEL]: . . . Did you have an understanding, in reading [Fong's] deposition, that he said, quote—

"[ASAHI'S TRIAL COUNSEL]: Objection, calls for hearsay.

"[ACTELION'S TRIAL COUNSEL]: They are very unreliable, because the revenue is so far off in the future. Did you gain understanding of that?

"THE COURT: Sustained on hearsay.

"[ACTELION'S TRIAL COUNSEL]: . . . When you read his deposition, you took it into consideration, did you not, in forming your opinions to the jury here this morning?

"A. Certainly. And Doctor Pennington and Mr. Santel as well, yes.

"Q. And when [Fong] said they were crude estimates, did that enter into your formulation of an opinion to the jury here this morning?

"[ASAHI'S TRIAL COUNSEL]: Objection, calls for hearsay. Discloses hearsay.

"THE COURT: Sustained."

Actelion contends that the trial court abused its discretion in sustaining the hearsay objections. Specifically, it asserts: "Rausser's testimony on these points would have served the non-hearsay purpose of showing whether Rausser factored Fong's characterization of the projections into his lost-profits calculations and, if so, to what extent. Fong's statement was 'not hearsay, since it is the hearer's reaction to the statement that [was] the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' *People v. Scalzi*[, *supra,*] 126 Cal.App.3d [at p.] 907 . . . [¶] . . . And [Actelion] was entitled to show the jury that Rausser, while relying on the CoTherix projections for his calculations, ignored Fong's characterization of those estimates as 'crude' and 'very unreliable.' "

Actelion's reliance on *People v. Scalzi, supra,* 126 Cal.App.3d 901, is misplaced. The court in that case described " 'one important category of nonhearsay evidence— evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer *and that the hearer, believing such information to be true, acted in conformity with that belief.* The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' [Citation.]" (*Id.* at p. 907, italics added.) Here, the record excerpted above makes clear that Rausser did not rely on Fong's statements or believe them to be true. Actelion was not merely seeking to show "whether Rausser factored Fong's characterization of the projections into his lost-profit calculations." It is quite clear that Actelion actually sought to bring Fong's out of court statements before the jury for the truth of the matter asserted in those statements.

*Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, is no more availing. In that case, an expert witness (Dr. Jacobus) was asked, on cross-examination, whether he had received and considered the report of another doctor (Dr. Jones) in formulating his opinion. On appeal, the plaintiff argued that the trial court erroneously overruled his hearsay objection to questions quoting Dr. Jones's report. (*Id.* at pp. 229–230.) In rejecting that argument, the court explained: "It is proper to draw from an expert testimony showing whether he has relied on or considered any authority in formulating his opinion and, *if he has done so*, to confront him with it if it contradicts him [citation]; and to cross-examine him on any books he may have used in forming it [citations]. Having expressed an opinion concerning his diagnosis and evaluation of plaintiff's condition *and having taken, among other things, Dr. Jones' report into consideration*, Dr. Jacobus was without doubt properly subject to cross-examination concerning it. [¶] Of interest in this connection is the fact that Dr. Jones was subsequently called by the court to appear as a witness 'because some mention was made of his report'; and he did so, sponsored by defendant. Plaintiff cross-examined him and had ample opportunity to fully question him concerning his report. He did not do so. *This appears to render ineffective the 'hearsay' argument . . . .*" (*Id.* at pp. 230–231, italics added.) Asahi's hearsay objection here, in contrast to *Hope v. Arrowhead & Puritas Waters, Inc.*, cannot be so easily dismissed as Fong was never called as a witness. The trial court did not abuse its discretion in sustaining Asahi's hearsay objections.

### 6. *Excluded Asahi Email*

Finally, Actelion contends that the trial court erroneously excluded an email, dated January 12, 2007, from Mark Smith, an Asahi licensing manager, to Yokota regarding the License Agreement. When Actelion sought to admit the email at trial, Asahi objected. The trial court sustained the objection, explaining: "It is [a party admission.] And it's a lay opinion of interpretation of the contract, which is not admissible evidence." Actelion argues that the trial court abused its discretion in sustaining the objection because "[s]ection 800 provides that a non-expert may offer 'such an opinion as is permitted by law,' " and was not inadmissible hearsay.

Legal opinion evidence from a lay witness is inadmissible. (*Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 289.) Section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion *as is permitted by law*, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Italics added.) Actelion suggests that the italicized language somehow allows a lay witness to testify regarding his legal opinions if his testimony would otherwise qualify for admission under one of the exceptions to the hearsay rule. However, sections 1220, 1222, 1230, and 1250, which Actelion cites, provide only that certain evidence "is not made inadmissible by the hearsay rule." The hearsay rule is not implicated here. Actelion, therefore, has not shown that the email was admissible under section 800.

Next, Actelion insists that "the contemporaneous understanding of a person responsible for implementing the contract is admissible to show what the contract means." Actelion relies on *DVD Copy Control Assn. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 712–713 (*DVD Copy Control Assn.*).

In *DVD Copy Control Assn., supra,* 176 Cal.App.4th 697, Kaleidescape licensed content scramble system technology (CSS) from the DVD Copy Control Association, Inc. (DVDCCA) in order to develop a home entertainment system for viewing DVD's. (*Id.* at p. 701.) A dispute arose when the DVDCCA demanded that Kaleidescape cease sales of its system. DVDCCA sued Kaleidescape for breach of contract a year later. The fundamental dispute at trial was whether the license agreement incorporated the CSS general specifications requiring the presence of a physical DVD for playback. (*Id.* at pp. 704–705.) DVDCCA introduced a memo prepared by Kaleidescape's chief technology officer, Stephen Watson, after Kaleidescape had received the package of specifications but before any dispute arose. The memo revealed Watson's understanding that the CSS general specifications was one of the previously undisclosed sets of specifications to which the license agreement referred. (*Id.* at pp. 707, 709.) The reviewing court observed: "The court may also look to the acts of the parties that show

what they believed the contract to mean. [Citation.] That is, 'the construction given [a contract] by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent.' [Citation.]" (*Id.* at p. 712.) Ultimately, the court concluded the Watson memo was admissible to show Kaleidescape's practical interpretation of the agreement before the dispute arose. (*Id.* at p. 718.) *DVD Copy Control Assn.* is not on point. Here, unlike the Watson memo, the Smith email was sent months *after* the License Agreement was negotiated and signed—at a time when a dispute over the meaning of the agreement had already arisen. The trial court did not abuse its discretion in excluding the email.[25]

C.      *Compensatory Damages*

The jury was instructed that to recover for lost M&R payments which Asahi claimed it would have received under the License Agreement (lost profits), "Asahi must prove it is reasonably certain it would have earned lost [M&R payments] but for the conduct of [Defendants]." The jury awarded Asahi $358.95 million in lost M&R payments. The jury also awarded Asahi $187.4 million in development costs that CoTherix would have undertaken for Asahi's benefit to bring Fasudil to market if it had continued to perform under the contract. Asahi accepted the trial court's remittitur that reduced the development costs award to $18.85 million.[26]

Actelion insists that damages are uncertain and speculative, and that the evidence does not support any damage award. Asahi challenges the remittitur on its cross-appeal. We find that the record supports both the jury's verdicts and the trial court's order, and we affirm the compensatory damages awards in their entirety.

---

[25] Actelion forfeited any argument with respect to Yokota's and Asano's testimony regarding their understandings of the License Agreement by failing to object to such testimony. (§ 353, subd. (a).)

[26] The jury awards of $450,000 in IND/Regulatory maintenance costs and $75,000 for lost investigator-sponsored study costs are not separately challenged here.

1.    *Legal Standards*

" '[D]amages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' (*Grupe v. Glick* (1945) 26 Cal.2d 680, 693.) . . . [¶] Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses. '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' ([*Id.*] at p. 692.) '. . . In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]' (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161–162.) [¶] 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But . . . anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' (*Grupe v. Glick, supra,* 26 Cal.2d at pp. 692–693.)" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774, parallel citations omitted (*Sargon*).)

In *Sargon*, the Supreme Court added a "cautionary note. The lost profit inquiry is always speculative to some degree. Inevitably, there will always be an element of uncertainty. Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been. Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative. A reasonable certainty only is required, not absolute certainty." (*Sargon, supra,* 55 Cal.4th at p. 775.)

We review a lost profits award for substantial evidence. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759–760.) " 'While lost profits can be established with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like, the underlying requirement for each is " 'a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' " ' [Citation.]" (*Sargon, supra,* 55 Cal.4th at p. 776.)

2.    *Evidence of Lost Profits*

Actelion launches two principal lines of attack on the lost profits award: first, it was speculative to assume that oral Fasudil ever would have obtained FDA and EMEA approval, much less on the timeline projected by CoTherix; and second, it argues it was speculative to determine the price and market share Fasudil would have commanded had it obtained regulatory approval and the timeline on which it would have achieved those results. We address these arguments in turn.

a.    *FDA and EMEA Approval*

As a preliminary note, we observe that the trial evidence on whether oral Fasudil would have obtained FDA and EMEA approval was relevant to two distinct issues at trial. The first was whether it was commercially reasonable for CoTherix or Actelion to discontinue development of Fasudil in January 2007. The second was whether Asahi could establish lost profits with reasonable certainty. As to the first issue, the only relevant evidence was facts known to Actelion as of January 2007, when it decided to discontinue development of Fasudil; as to the second, the relevant evidence includes all facts known at the time of trial that might prove lost profits damages with reasonable certainty to the jury. We consider here the broader scope of relevant evidence that would support a verdict.

By the time of trial, several reports of scientific studies were available to the jury. These reports included a substantial amount of preclinical data (basic science and animal studies) on three formulations of Fasudil (intravenous Fasudil, ER Fasudil, & immediate release oral Fasudil or IR Fasudil); a clinical study of intravenous Fasudil in Japan;

Phase I, Phase IIa, Phase IIb and long-term open-label clinical (human) studies of IR Fasudil; Phase I clinical studies of ER Fasudil; and data on two patient populations who had used intravenous Fasudil (15 years of use in Japan to treat subarachnoid hemorrhage patients; approximately one year of off-label use in China to treat 200 PAH patients).

Asahi presented the testimony of several experts who testified that data from the aforementioned studies established to a reasonable certainty that ER Fasudil would have been effective in treating both SA and PAH, would have had an acceptable safety profile, and consequently would have been approved by the FDA and EMEA on CoTherix's projected timeline.[27] The witnesses included experts on SA (Robert Weiss, M.D.) PAH (Jing & R. James White, M.D.), Rho-kinase (James K. Liao, M.D.), nephrotoxicity (Stuart Linas, M.D.), drug toxicity (Laura Plunkett, Ph.D.), and the FDA and EMEA approval processes (Jing, White, Plunkett, & Michael Tansey, M.D.).

The medical experts testified that Fasudil had been shown to have physical effects that were known to correlate with increased exercise time, an "endpoint" required by the FDA before the drug could be approved to treat SA or PAH. Scientific studies of the effects of Fasudil on lung circulation were positive, and treating physicians and leading physicians in the treatment of PAH had expressed enthusiasm about the drug's potential for cardiovascular treatment. The toxicity shown in certain preclinical studies were not a concern because those studies were designed to identify toxicity at high doses. Increases in creatinine levels shown in the IR Fasudil studies were not clinically significant, were reversible, and could be avoided with an extended release formulation. Indeed, CoTherix's Phase I study of ER Fasudil showed that therapeutically effective doses of

_____

[27] Defendants moved in limine to exclude all opinion that Fasudil would achieve necessary regulatory approvals. The trial court considered and denied the motions except as to Rausser.

Actelion argues Asahi's experts were not qualified to testify regarding regulatory approval by the EMEA. Asahi's counsel, however, specifically elicited testimony by these experts regarding the bases for their opinions on EMEA approval, and Actelion raised no objection. The argument is forfeited. (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742.)

Fasudil were well tolerated in healthy volunteers, the China experience showed intravenous Fasudil could successfully treat PAH with no undue side effects, and the long experience of short-term intravenous Fasudil use (up to two weeks) by subarachnoid hemorrhage patients in Japan provided a robust safety record. Particularly because of the severe effects of SA and PAH and the limited efficacy of the SA and PAH drugs that had been approved, the safety concerns were not a likely obstacle to FDA approval and there were no other regulatory "show-stoppers." Other SA and PAH drugs on the market had adverse safety profiles. Moreover, CoTherix's projected timeline for regulatory approval was reasonable because there were no significant obstacles to proceeding to a Phase III study, CoTherix had a track record in obtaining FDA approval for Ventavis in record time, and the timeline had been developed by two experienced pharmaceutical companies (CoTherix and Asahi).

On the question of regulatory approval, Actelion does not cite contrary testimony by independent experts, but rather relies on the acknowledgement by Asahi's witnesses that FDA approval is unpredictable until a Phase III study is done, and the negative opinions by Actelion personnel. It argues that CoTherix had nothing more than a "hope" of regulatory approval. Actelion emphasizes that no Phase III trial of ER Fasudil to treat SA or PAH had ever been conducted. It draws attention to numerous statements by CoTherix personnel or Asahi experts that a Phase III study is necessary to prove efficacy and safety and there is no guarantee of FDA approval absent such a study. However, the standard of proof for lost profit damages is *reasonable* certainty, not absolute certainty. (*Sargon, supra,* 55 Cal.4th at p. 775.) Actelion notes that only a small percentage of drugs that enter development are ever approved by the FDA, but it ignores Asahi experts' testimony that the probability of approval increases as development proceeds through the Phase I, II and III clinical trial process and that oral Fasudil was well along in that process. Donald Santel (former chief executive officer of CoTherix) confirmed that the probability of approval "depends on the stage of development that one is in. It becomes more probable as time goes on." Moreover, there was substantial evidence presented to the jury that Actelion acquired CoTherix, and paid a market premium to do so, precisely

because *Actelion* believed that Fasudil would be approved and would become a competitive threat to its existing product, Tracleer.

There is no rule prohibiting recovery of lost profits damages simply because regulatory approval is a prerequisite to selling a product. (*SCEcorp v. Superior Court* (1992) 3 Cal.App.4th 673, 678–679; see *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 448–457 [lost profits recoverable on hotel/condominium project never built after town, which was party to development agreement, withdrew support despite fact that regulatory approvals were conditions precedent to completion of project].)[28]

Actelion argues that Asahi's inability to find a successor licensee for Fasudil demonstrates substantial uncertainty about the medical or commercial viability of the drug. Asahi experts, however, provided credible alternative explanations for that outcome: Actelion's abandonment of the drug had a chilling effect on competitors because it implied that Actelion had undisclosed knowledge of flaws in the drug, and time lost in obtaining a new licensee reduced the value of the drug, which depended on commercial exploitation during the life of the underlying patents and a unique window of opportunity in 2006–2007.

---

[28] At least one federal trial court, applying California law, has found lost profits were recoverable in a pharmaceutical case despite the noncertainty of FDA approval. (*Onyx Pharmaceuticals, Inc. v. Bayer Corporation* (N.D.Cal., May 10, 2011, No. C09-2145 MHP) 2011 WL 7905185 [under California law, factfinder could find profits reasonably certain based on expert evidence there was an 80% chance of approval to treat at least one condition].) Pharmaceutical cases in which courts have held to the contrary are distinguishable on their facts. (*AlphaMed Pharmaceuticals v. Arriva Pharmaceuticals, Inc.* (S.D.Fla. 2006) 432 F.Supp.2d 1319, 1339–1340, 1346–1352 [applying reasonable certainty standard and listing multiple assumptions underlying lost profits claim that were either proved false by trial evidence or were unsupported by evidence]; *Microbix Biosystems, Inc. v. Biowhittaker, Inc.* (D.Md. 2000) 172 F.Supp.2d 680, 698–699 [applying reasonable certainty standard and reversing award where new business would have had to achieve several new milestones before intervening events prevented business's success].)

It is for the jury to determine the probabilities as to whether damages are reasonably certain to occur in any particular case. (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97.) Substantial evidence, including competent expert testimony, supported the jury's finding that, if CoTherix had continued developing Fasudil, there was a reasonable certainty ER Fasudil would have obtained FDA and EMEA approval to treat SA and PAH on the timeline projected by CoTherix.

b.      *Price, Market Share, and the CoTherix Timeline*

Having determined there was sufficient evidence of the *fact* of lost profit damages, we turn to the reliability of Asahi's evidence regarding the projected price and market share of Fasudil, which set the *amount* of damages. " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' [Citation.])' " (*Sargon, supra,* 55 Cal.4th at pp. 774–775; *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883–884; *AlphaMed Pharmaceuticals v. Arriva Pharmaceuticals, Inc., supra,* 432 F.Supp.2d at p. 1342 [discussing *Story Parchment Co. v. Paterson Parchment Paper Co.* (1931) 282 U.S. 555, 563].) "If lost profits can be estimated with reasonable certainty, a court may not deny recovery merely because one cannot determine precisely what they would have been." (*Sargon, supra,* 55 Cal.4th at p. 779.)

In September 2006, CoTherix prepared revenue projections for Fasudil through 2019 for the purpose of negotiating its sale price with Actelion. Actelion dismisses these projections as "guesswork" without foundation and contends that Rausser's lost profits calculations are "fatally defective because Rausser essentially adopted rosy projections prepared by CoTherix employees who were not proven to be qualified to create reliable forecasts." But the evidence presented showed that the projections were based in part on

CoTherix's findings during its internal due diligence process, which included consultation with experts, before it signed the License Agreement with Asahi, and on market surveys that were conducted before Actelion expressed interest in buying CoTherix.[29] The September 2006 projections estimated product launch dates (which were consistent with the projected regulatory approval timeline), an initial price for ER Fasudil, annual price increases, numbers of patients in target populations for both conditions with annual increases, initial market penetration into those populations with annual increases, and resulting net revenues.[30] On at least one measure (size of the targeted SA population), the projections were more conservative than CoTherix's commercial assessment of Fasudil before it entered into the License Agreement. Rausser testified that he reviewed academic literature on market dynamics, industry data on drug sales, and the discovery record of the instant action, and confirmed that each element of the CoTherix projections was reasonable if not too conservative. Asahi's medical experts also generally corroborated the market penetration and price projections.

---

[29] We do not agree with Asahi's argument on appeal, or the testimony of Asahi's economic expert Rausser at trial, that substantial evidence shows Actelion adopted or relied on CoTherix's September 2006 projections while negotiating its acquisition of the company. Although Actelion sent the CoTherix projections to its advisers, Lehman Brothers, and reviewed them at its board meeting on the proposed acquisition, Lehman Brothers disclaimed any independent verification of the figures and the board presentation itself demonstrates that, in contrast to CoTherix's projections, Actelion projected zero revenue from Fasudil as a result of the acquisition. However, there was testimony that the 70 percent premium Actelion paid for CoTherix could be explained by the value of keeping Fasudil off the market, particularly in light of negative information about Ventavis that was disclosed during Actelion's due diligence process.

[30] CoTherix projected a price of $5,000 per patient per year for both SA and PAH in 2006 with 5 percent annual price increases; a targeted SA population (refractory SA patients) of 929,000 in 2011, rising to 986,000 in 2017; market penetration in this SA population of 2 percent in 2011, rising fairly steadily to 8 percent in 2015 and holding at 8 percent through 2017; a PAH population of 24,000 patients in 2011, rising to 32,000 in 2017; PAH market penetration of 4 percent in 2012, rising to 30 percent in 2017. These projections, which were the middle case of three projected scenarios, resulted in net revenue in the SA market of $86 million in 2011, rising to $695 million by 2017, and net revenue in the PAH market of $5 million in 2012 that rises to $78 million by 2017.

Actelion seeks to compare the CoTherix projections to those found to be too speculative in *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 (*Parlour*). We are not persuaded. The *Parlour* projections were prepared to attract investment for a new business, they included broad disclaimers, and the witness who presented the projections at trial did not know who prepared the projections or what methodology they had used. (*Id.* at pp. 289–290.) Here, although the CoTherix projections were prepared during negotiations for sale of the company, CoTherix had already demonstrated its genuine belief in the commercial potential of the product by entering into the License Agreement and making a substantial commitment of its own resources (approximately $187.4 million) to develop and market the drug. CoTherix's former chief executive officer, Santel, testified that the projections were prepared based on the best efforts of his experienced staff and represented the company's best opinion (the middle of three cases) of future revenue. Moreover, Rausser testified that he independently verified the market assumptions underlying the projections and Asahi medical expert testimony supported the market share projections at least in part.

Actelion argues the "range" of lost profit estimates provided by Rausser itself indicates that the estimates were unreasonably speculative. However, Rausser provided two distinct estimates rather than a range and he specified the different assumptions on which they were based, described the facts he relied on to make the different assumptions, and explained precisely how the two figures were calculated. In these circumstances, the mere spread of the two numbers does not render his opinion speculative.

Actelion contends that Rausser's projected price for Fasudil of $5,000 per patient per year is "utterly fanciful." Actelion contends the price projection was unrealistic because Rausser conceded that Fasudil would sell for the same price in the SA and PAH markets and that competing SA drugs sell for as little as pennies a day. However, the specific SA population targeted by CoTherix consisted of patients who had not responded to existing therapies or had other complications, so the price of other SA drugs would necessarily keep Fasudil out of this particular niche of the SA market. Actelion does not

contest the evidence that competing PAH drugs were selling for far more than $5,000 per patient per year, which supports the view that CoTherix could command such a price in the PAH market, where the penetration level was projected to be about quadruple that of the targeted SA market. Actelion also ignores the fact that its own PAH product, Tracleer, commanded a price almost seven times as high as the projected price of Fasudil (approximately $34,000/year in 2006 and over $43,000 in 2008).

Actelion characterizes this case as a "new business" case and argues there is insufficient evidence of prior performance by CoTherix selling Fasudil or by similar businesses selling a similar product to support the lost profit damages. But this case does not fit neatly into the established business/new business paradigm. Unlike the company at issue in *Sargon*, CoTherix had a track record of obtaining FDA approval for and marketing a PAH drug (Ventavis) and had a sales and marketing team already in place. (Cf. *Sargon, supra,* 55 Cal.4th at pp. 778–780.) Rausser verified the CoTherix projections by reviewing the pharmaceutical market specifically for SA and PAH drugs. Actelion's suggestion that the only adequate comparison would be to a company already selling Fasudil is an overreach: the case law requires reasonable certainty, not absolute certainty, and once the occurrence of lost profits is established a plaintiff has greater leeway in establishing the extent of lost profits, particularly if the defendant was shown to have prevented the relevant data from being collected through its wrongful behavior. (See *Sargon, supra*, 55 Cal.4th at p. 775.)

Actelion also attacks the reliability of Rausser's expert opinion generally, including reference to instances in which a federal trial court has found his testimony flawed or unpersuasive.[31] Our concern, however, is with the testimony given by Rausser in this case. Actelion does not challenge Rausser's extensive qualifications as expert in economics. As in *Sargon*, the trial court "presided over a lengthy evidentiary hearing and provided a detailed ruling." (*Sargon, supra,* 55 Cal.4th at p. 776.) The court heard

---

[31] Asahi responds with citation to federal trial court cases reaching contrary conclusions.

testimony from Rausser in an section 402 hearing over two days, on January 13 and 19, 2011, in response to an Actelion motion in limine. The trial court issued a detailed order granting the motion in part, and set the parameters of the testimony Rausser would be permitted to give. Rausser testified within those parameters. Unlike *Sargon*, this is not a situation in which the trial court's gatekeeper role required exclusion of speculative expert testimony. We have reviewed Rausser's testimony and find nothing that would have required the trial court, or the jury, to reject his conclusions, or that would require us to do so. In sum, we conclude the lost profits award is supported by substantial evidence.

3.       *Development Costs*

In addition to estimating Asahi's lost M&R payments, Rausser opined that Asahi lost the value of the development efforts CoTherix committed to fund and perform under the contract, a total of $187.4 million in 2009 dollars. The jury awarded Asahi this full amount in addition to its award of lost profits. Neither the lost profits award nor the development costs award was segregated by the jury as to the two types of Fasudil (oral & inhaled) that would have been developed or marketed absent Actelion's interference.[32]

Posttrial, the court granted Actelion's motion to offset the development costs award by $69.35 million, in light of the ICC Arbitration award. Actelion moved for a new trial on the ground, inter alia, that that the award of both lost M&R payments and development costs was duplicative because Asahi had presented them as alternative measures of damages, and because California law required them to be alternative measures of damages. The court agreed that any award of development costs would be duplicative as to oral Fasudil, but not as to inhaled Fasudil. The court had excluded evidence of lost profits for inhaled Fasudil because Rausser had testified at the section 402 hearing that his lost profit calculations on inhaled Fasudil were not based upon any projections calculated by CoTherix or Asahi or internally prelitigation by Asahi, or anyone else in the pharmaceutical industry. Therefore the jury could not have

---

[32] CoTherix was obligated to develop inhaled Fasudil. CoTherix began development and inhaled Fasudil studies were approved, but placed "on hold" in November 2006, and never completed because of the Actelion acquisition of CoTherix.

awarded any lost profits damages for interference with the development of inhaled Fasudil, so any development costs awarded for inhaled Fasudil would not be duplicative.

Rausser identified total development cost damages for inhaled Fasudil of $67.27 million. The court offset $48.42 million of these costs based on the ICC Arbitration award, and conditionally granted a remittitur to $18.85 million, the difference between these figures. Asahi challenges the reduction of the award and Actelion challenges the court's allowance of the reduced award. We affirm the modified award of $18.85 million.

a.     *Trial Court's Reduction of the Development Costs Award*

In its cross-appeal, Asahi argues the trial court erred by reducing the award of development costs to exclude costs for development of oral Fasduil. Asahi argues the court erred in (1) impliedly ruling that Asahi was estopped from claiming both lost M&R payments and development costs as damages because it had represented throughout trial that they were alternative measures of damages, and (2) ruling that an award of both forms of damages would result in a double recovery for Asahi. We affirm the court's estoppel ruling and thus need not address the second issue.

" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose:  to protect the integrity of the judicial process.' [Citation.]" (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.) Judicial estoppel is an equitable doctrine and its application is discretionary. (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 170.) We find no abuse of discretion in the trial court's ruling.

The trial court wrote, "[T]hroughout the trial, and explicitly as part of the expert witness trial testimony of Plaintiff's damages expert Gordon Rausser, the Development Costs compensatory damages were presented as 'alternative damages' to the Lost [M&R] Payment compensatory damages. Plaintiff's damages theory of the case, as presented at the trial, and as supported by the expert witness evidence, was that Development Costs should be awarded as compensatory damages *if* the jury did not award Lost Profits as

compensatory damages." Contrary to Asahi's representations on appeal, this description is supported by the record.[33]

Asahi argues the trial court "rejected [Actelion's] argument that Asahi was estopped . . . from obtaining development cost damages for inhaled Fasudil," but fails to clarify how limited this ruling was. The trial court wrote, "Plaintiff could seek, and the jury could award, alternative damages calculations *as to different products and indications*." (Italics deleted & added.) Indeed, the court noted that Asahi had taken precisely this view during arguments over the verdict form. Asahi's counsel told the court that both M&R payments and development costs should be on the verdict form because the jury "could give lost [M&R] payments [for oral Fasudil], but because there are no lost royalties for inhaled, . . . [give] the development costs related to inhaled." The court adopted this approach when it ruled on the new trial motion: it allowed an award of development costs for inhaled Fasudil on the assumption that the jury's award of lost M&R payments (which was less than Asahi's request) covered only payments for oral Fasudil. On that basis, Asahi cannot collect development costs for oral Fasudil in addition to the lost M&R payments it has already been awarded.

---

[33] In its opening statement, Asahi repeatedly told the jury Asahi's benefit under the License Agreement would have been more than $600 million, which matches Rausser's "base case" estimate of lost [M&R] payments alone. Just after making this point, Asahi's counsel told the jury, "[T]here's an alternate damage number that could be used . . . . The minimum damages. . . . [¶] . . . [S]etting aside any profits that Asahi ever would have been entitled to, this is the work that CoTherix had obligated itself to do to complete the development of [F]asudil," which amounted to $187.4 million in damages. Rausser similarly told the jury that his development cost estimate was "an alternative damage measure" that "goes to what commitment did CoTherix make to Asahi in their licensing agreement, with respect to developing" Fasudil. In closing argument, Asahi told the jury, "We have [$]187.4 million for the uncompleted development work. Then, in the alternative, would be lost royalties and milestones. Let me make clear, this should not be added together. It would be one or the other." Asahi's attempts to explain away these statements are unconvincing.

      b.      *Trial Court's Allowance of Development Costs for Inhaled Fasudil*

For its part, Actelion argues the trial court erred in allowing the award of $18.85 million in development costs for inhaled Fasudil to stand. We disagree.

First, Actelion argues that "this measure of damages—the cost to CoTherix of performing, rather than the value of the performance to Asahi (i.e., its alleged lost profits)—'violates fundamental precepts of contract damages.' *Fisher v. Hampton* (1975) 44 Cal.App.3d 741, 752 . . . ." In *Fisher v. Hampton*, two limited partners sued their general partner for failing to drill an oil well as required by their partnership agreement. (*Id.* at pp. 743–744, 746.) The court held that the plaintiffs, who had not proven lost profits with reasonable certainty (*id.* at pp. 747–748), could not collect the cost of drilling the well as an alternative measure of damages (*id.* at pp. 750–752). "Awarding damages based on the 'cost of performance' . . . instead of on the basis of the loss or injury actually sustained by the promisee . . . violates fundamental precepts of contract damages." (*Id.* at p. 752.) Here, in contrast, there was evidence that developing Fasudil (i.e., conducting trials and pursuing FDA and EMEA approval) had value to Asahi independent of whether the drug was ever approved and sold in the U.S. and European markets. Asahi witness Yokota testified that the License Agreement was part of a "bridging strategy" that allowed Asahi to take advantage of the large U.S. population to conduct trials on the drug (the Japanese PAH population was too small) and obtain FDA approval, which could then be used to gain approval of the drug in other countries. Further, the record on lost profits that we reviewed *ante* amply demonstrates that trials and approvals of one formulation of the drug can help prove the efficacy and safety of another formulation of the drug, and trials and approvals of the drug to treat one condition can help prove the efficacy and safety of the drug to treat another. Thus, Actelion has not demonstrated that the cost to CoTherix of developing the drugs as required by the License Agreement was unrelated to the losses Asahi experienced as a result of termination of that agreement.[34]

---

[34] This analysis also applies to the award of investigator-sponsored study costs.

Actelion also argues that the award was not supported by substantial evidence as to the amount of the damages.[35] The trial court disagreed, holding that Rausser's expert opinion on the amount of the inhaled Fasudil development costs itself was sufficient evidence of those costs, even if the evidence underlying that opinion was never admitted in evidence. This ruling was correct. (See § 801, subd. (b) [expert opinion may be based on inadmissible evidence].) The court further noted that evidence supporting Rausser's opinion on this issue was presented to the court during hearings outside the presence of the jury and most of that evidence was eventually admitted in evidence before the jury. Thus, it ruled, there was an adequate foundation supporting the admission of the expert testimony on the amount of the development costs. The court noted that, during cross-examination, Actelion chose to "focus[] upon attacking the discount rate used, and the reliability or unreliability of CoTherix projection spreadsheets," and made "no substantive attack or discussion during cross-examination upon the calculations themselves (other than discount rate)." Thus, although Actelion had an opportunity to challenge the foundation for Rausser's opinion, it failed to do so. On this trial record, the court ruled, the jury reasonably found that the amount of the development costs had been proved at trial, and the court expressly concurred in that finding. We agree that the award of development cost damages is supported by substantial evidence.

4.     *CoTherix's Unilateral Termination Right as a Limitation on Damages*

As to both the lost M&R payments award and the development costs award, Actelion argues Asahi was not entitled to any damages after June 23, 2009, because CoTherix could have unilaterally terminated the License Agreement without cause as of that date. Most of the damages that were awarded accrued after that date: the

---

[35] Actelion further argues that the award was not supported by substantial evidence of proximate causation. This argument is forfeited because Actelion did not raise it below. (*Ward v. Taggart, supra,* 51 Cal.2d at p. 742.) In any event, CoTherix was obligated to pursue development of inhaled Fasudil as long as the License Agreement remained in effect, and the evidence that oral Fasudil was likely to be approved and sold as anticipated supports the inference that, absent interference by the Defendants, the License Agreement would have remained in effect through 2019.

development costs award that represented work on inhaled Fasudil that would have occurred after June 23, 2009, and sales of Fasudil were not projected to start until 2011, so all M&R payments also would only have been recognized after June 23, 2009.

On the evidence presented at trial, the jury reasonably could have found that CoTherix would not have exercised its termination right in 2009, or any time before 2019, and therefore found that damages were not too speculative. CoTherix's former chief executive officer, Santel, testified that CoTherix had no intention of terminating the contract as of January 2007, on the eve of the merger with Actelion. Moreover, trial evidence demonstrated that the prospects for FDA and EMEA approval and sales of ER Fasudil were good, supporting an inference that CoTherix would not have terminated the License Agreement in June 2009.

Actelion cites cases holding as a matter of law that plaintiffs cannot collect damages after the date a breaching party has the right to unilaterally terminate the contract. (See, e.g., *Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 409.) These cases, however, involve *contract* damages, which are limited to those foreseeable by the parties at the time of contracting. (*Ibid.*) Here, the issue is tort damages that are not so limited. (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1128 ["[d]espite the express termination clause, plaintiff was protected against unjustified interference by third parties"].)

D.    *Punitive Damages*

As noted *ante,* the jury awarded punitive damages against the Individual Defendants only: $19.9 million against Jean-Paul; $8.9 million against Martine; and $1.2 million against Simon. The Individual Defendants argue that it is unprecedented for a jury to impose punitive damages on corporate officers and not on the corporation itself, although they do not provide either factual or legal support for their protests. The Individual Defendants further argue there was insufficient evidence of malice, oppression or fraud to support the punitive damages awards against them. We disagree.

1.   *Evidence of Malice, Oppression or Fraud*

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."  (Civ. Code, § 3294, subd. (a).)  Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (Civ. Code, § 3294, subd. (c)(2).)  Fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  (Civ. Code, § 3294, subd. (c)(3).)

We review the jury's findings of malice, oppression or fraud for substantial evidence.  "But since the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden.  In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .'  (*Tomaselli v. Transamerica Ins. Co.*[ (1994)] 25 Cal.App.4th [1269,] 1287 [(*Tomaselli*)].)"  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891 (*Shade*).)  "As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment.' [Citation.]"  (*Ibid.*)

We reject Asahi's suggestion that the evidence establishing Defendants' liability for the intentional interference torts itself was necessarily sufficient to support the punitive damages award.  Asahi cites *Tomaselli*'s statement that, "Civil Code section 3294, subdivision (c)(1) provides that 'conduct which is intended by the

defendant to cause injury to the plaintiff' constitutes malice, and malice is a basis for an award of punitive damages. In the ordinary ex delicto action, therefore, involving intentionally wrongful conduct, the evidence sufficient to establish the tort is usually sufficient to support punitive damages." (*Tomaselli, supra,* 25 Cal.App.4th at p. 1286.) However, *Tomaselli* also states that, in contrast, evidence of a "simple breach of contract, *no matter how willful and hence tortious* [(e.g., bad faith breach of an insurance contract)], is not a ground for punitive damages. Such damages are accessible only upon a showing that the defendant 'act[ed] with the intent to vex, injure, or annoy.' [Citation.]" (*Ibid.,* italics added.) Here, the jury found the Individual Defendants liable for intentional interference with contract. While requiring evidence of intent or willfulness, this tort does not require evidence of an intent *to injure the plaintiff*. (*Applied Equipment, supra,* 7 Cal.4th at p. 514, fn. 5.) Therefore, proof that the Defendants wrongfully interfered with the License Agreement did not in itself establish the necessary prerequisites for an award of punitive damages.

We nevertheless find sufficient evidence in the record to support the jury's finding by clear and convincing evidence that the Individual Defendants acted with malice or fraud. First, the jury could reasonably find that the Individual Defendants formulated and orchestrated Actelion's tactics in eliminating Fasudil as a competitive threat to Tracleer given their high-level positions within Actelion, personal involvement in the CoTherix acquisition, and their communications with Asahi about the potential for future development of Fasudil after the acquisition.[36] Although some of the most inflammatory

---

[36] The Individual Defendants suggest that the only conduct relevant to the punitive damages award is conduct up to and including Actelion's January 2007 notice to Asahi that it would not pursue development of Fasudil. They cite case law holding that "such 'malice' [or fraud or oppression] as will support an exemplary damage award must directly attend the subject of the cause of action upon which the claim for such damages is based." (*Henderson v. Security Nat. Bank* (1977) 72 Cal.App.3d 764, 773.) Because no judgment was entered on the intentional interference with prospective economic advantage claim, the Individual Defendants argue the only relevant conduct was that giving rise to liability for intentional interference with contract, which they claim "took place no later than the date on which Actelion notified Asahi that CoTherix would stop

comments in the record—director of business development Carina Spaan's comment that purchasing CoTherix would "leave the market for Tracleer free for Actelion"; head of business development Michael Gaitonde's recommendation "to rubbish the value of Fasudil as much as possible"; and director of business development Luca Bolliger's comment that "we [at Actelion] painstakingly killed" Fasudil—came from other Actelion employees, the jury could reasonably infer from the Individual Defendants' controlling positions in the company and their direct and active involvement in the company's dealings with CoTherix and Asahi that these comments are candid characterizations of the course of conduct the Individual Defendants themselves endorsed or set in motion. Indeed, several comments attributed to the Individual Defendants themselves are consistent with the comments that Actelion attempts to set apart: Simon wrote notes suggesting that the company should "mudsling . . . Fasudil['s] great promise," and wrote on the eve of the acquisition that if Asahi balks at the contract termination, "we could discuss risk-benefit ratio and the need to discuss several issues with the FDA before proceeding!  I think [we] will be able to deal with them effectively!"  Jean-Paul personally wrote the March 23, 2007 letter that Asahi viewed as threatening; and Martine personally wrote a due diligence report on Fasudil that concluded—contrary to the weight

---

developing [F]asudil."  (The Individual Defendants similarly argue that, although the jury was instructed to make malice, oppression or fraud findings with respect to both intentional interference claims ("interfere[nce] with the [License Agreement] or Asahi's prospective economic relationship with CoTherix"), "the jury found *only* that the various defendants had acted with malice, fraud or oppression in 'interfering with the [License Agreement].' "  This is incorrect:  the jury made malice, fraud or oppression findings with respect to both torts.)

Contrary to the Individual Defendants' implication, the tort claims were not premised on conduct or harm allocated to different periods of time (e.g., a theory that the contract tort applied to the pre-acquisition period and the prospective economic advantage tort applied to the post-acquisition period).  Rather, they were alternative theories of liability for the Defendants' entire course of conduct.  No distinction was drawn in Asahi's presentation, in the jury instructions or on the verdict form between the categories of damages that were allegedly caused by the Defendants' intentional interference with contract and those that were allegedly caused by Defendants' intentional interference with prospective economic advantage.

of expert testimony at trial—that Fasudil should not be pursued because of its "lack of intrinsic potency," its "significant safety concerns," the "very primitive stage of development of this oral form of [F]asudil," and "the IP situation," all of which she identified as "significant weaknesses."

Second, the jury could have found by clear and convincing evidence that the Individual Defendants used fraud to commit the tort. Asahi was not required to plead a cause of action for fraud before the jury could find "fraud" for the purpose of determining liability for punitive damages. (See *Pistorius v. Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 556.) Here the evidence would support a conclusion that each Individual Defendant participated in (1) a pre-acquisition scheme to mislead Asahi about their intent to discontinue development of Fasudil after acquisition; or (2) a post-acquisition scheme to conceal the true reasons for discontinuing development of Fasudil (to prevent competition with Tracleer) and misrepresented those reasons (claiming safety concerns) in an attempt to both hide their wrongdoing and coerce Asahi into dropping demands against Actelion.

Finally, the jury could have found by clear and convincing evidence that the Individual Defendants' conduct was despicable or showed willful and conscious disregard for others (i.e., malice). By impeding the development of Fasudil, Actelion not only sabotaged a competitive and forseeably profitable commercial venture, but prevented a drug with the potential for alleviating the suffering of patients with life-threatening and debilitating diseases from reaching the market.

The Individual Defendants argue that their conduct was comparable to the conduct of defendants in cases where punitive damages were found unwarranted. (*Tomaselli, supra,* 25 Cal.App.4th at p. 1288 [insurer liable for bad faith handling of insurance claim, but evidence showed only negligence and slipshod investigation and no course of conduct harming the general public]; *Shade, supra,* 78 Cal.App.4th at p. 892 [insurer liable for bad faith handling of claim but coverage issues were extremely complex and losses were purely economic]; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1051–1052 [attorney found liable for breach of fiduciary

duty for accepting employment by another party in a case over client's objections nevertheless did not reveal any of client's confidential information].) In our view, their conduct was comparable to conduct found sufficient to support a punitive damages award. (See, e.g., *Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 847 [insurer's established company practice resulted in denial of coverage to severely mentally ill insured]; *Ball v. Posey* (1986) 176 Cal.App.3d 1209, 1212–1213, 1216 [attorney exercised undue influence over elderly, frail client in order to convert her assets to his own use].)[37] An "award of punitive damages finds a justification where it serves to deter socially unacceptable corporate policies." (*Hughes*, at p. 847.)

> 2. *Amount of Punitive Damages Awards*

The Individual Defendants argue the punitive damages awards against them were excessive under both constitutional and state law standards. We find no error.

> a. *Constitutional Standards*

"[T]he United States Supreme Court has determined that the due process clause of the Fourteenth Amendment to the United States Constitution places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. [Citations.] The imposition of 'grossly excessive or arbitrary' awards is constitutionally prohibited, for due process entitles a tortfeasor to ' "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." ' [Citations.] [¶] Eschewing both rigid numerical limits and a subjective inquiry into the jury's motives, the high court eventually expounded . . . a three-factor weighing analysis looking to the nature and effects of the defendant's tortious conduct and the state's treatment of comparable conduct in other contexts. As articulated in *State Farm* [*Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 (*State Farm*)], the constitutional 'guideposts' for reviewing courts are: '(1) the degree of

---

[37] Although these cases were decided before 1987 amendments to Civil Code section 3294 raising the standards for imposing punitive damages (see *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 331), we conclude the punitive damages award here is supported under the current standards, as explained *ante.*

reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' [Citations.]" (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171–1172.) The court may also consider the defendant's financial condition, which is relevant to fixing an amount of punitive damages sufficient to deter and punish misconduct, a California public policy goal that is constitutionally permissible under the due process clause. (*Id.* at pp. 1184–1185.)

Appellate courts "are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decisionmaker's caprice.' " ' [Citation.] [¶] . . . [F]indings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference. [Citations.]" (*Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at p. 1172.) However, findings cannot be inferred simply from the size of the punitive damages award; such an approach "would be inconsistent with de novo review, for the award's size would thereby indirectly justify itself." (*Id.* at p. 1173.)

The Individual Defendants focus their argument on the reprehensibility factor, which is " 'the most important indicium of the reasonableness of a punitive damages award.' " (*Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at p. 1180.) We " 'determine the reprehensibility of a defendant by considering whether: [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or

was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' [Citation.]" (*Ibid.*)[38]

On factor 2, the jury could reasonably have found that the Individual Defendants' tortious conduct "evinced an indifference to or a reckless disregard of the health or safety of others." The Individual Defendants' success in keeping Fasudil from reaching the market deprived certain SA and PAH patients of a drug likely to be effective in treating their debilitating disease, and in the case of PAH patients, at a much reduced cost. The Individual Defendants correctly note that the jury made no such express finding, and we agree that the finding cannot be inferred solely from the size of the punitive damages award (see *Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at p. 1173), but the finding is nevertheless implicit in the jury's compensatory damages award. The jury could award lost profits damages only if it found to a reasonable certainty that Fasudil would have been found effective and safe to treat SA and PAH patients and thus would have gained regulatory approval and reached the marketplace. In contrast to *Simon v. San Paolo U.S. Holding Co., Inc.*, the jury here implicitly made the finding because it awarded lost profits damages, which concluded the implicit findings are supported by substantial evidence in the record. (*Ibid.*)

The Individual Defendants argue that harm to nonplaintiff patients is irrelevant to the reprehensibility analysis.[39] The Supreme Court has held to the contrary: "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff

---

[38] We agree with the Individual Defendants that the compensatory damages awarded by the jury represented economic rather than physical injury (factor 1), and Asahi does not contend it was a financially vulnerable plaintiff (factor 3).

[39] The Individual Defendants also argue that "the California Supreme Court has recognized . . . that [factor 2] is definitionally inapplicable in cases involving purely economic torts." However, they misconstrue their cited case, *Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th 1159. Reviewing the five reprehensibility factors, the court began by stating, "Here, defendant's tortious acts caused only economic harm and did not show disregard of others' health or safety. The first two subfactors are clearly inapplicable." (*Id.* at p. 1180.) In no way did the court suggest that factor 2 is *never* applicable when a defendant's misconduct caused only economic harm.

also posed a substantial risk of harm to the general public, and so was particularly reprehensible . . . [However], a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." (*Philip Morris USA v. Williams* (2007) 549 U.S. 346, 355 (*Philip Morris*).) The Individual Defendants cite *Textron Financial Corp. v. National Union Fire Ins. Co.* for the principle that " '[D]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against the defendant under the guise of reprehensibility analysis . . . . [Citation.]' (*State Farm, supra,* 538 U.S. at p. 423.)" (*Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1083 (*Textron*), disapproved on other grounds by *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 382.) However, *Textron* directly relied upon the Supreme Court's quoted statement in *State Farm* and was decided before the Supreme Court's later clarification of *State Farm* in *Philip Morris*.[40]

---

[40] In *State Farm,* the jury heard evidence of the defendant insurance company's business practices in several states over a period of 20 years, and the plaintiffs framed the case as an opportunity to rebuke the company for its nationwide activities even if those activities were lawful in the states where they occurred. (*State Farm*, 538 U.S. at pp. 415, 420–421.) The Supreme Court held a state could not punish conduct that might have been lawful where it occurred, generally did not have a legitimate concern in punishing conduct that occurred outside its jurisdiction, and could not premise punitive damages on "dissimilar acts, independent from the acts upon which liability was premised." (*Id.* at p. 422; see *id.* at pp. 421–423.) Here, in contrast, the harm to SA and PAH patients resulted from the very conduct on which liability was based. Even if limited to California patients, the harm supported a reprehensibility finding.

In *Philip Morris*, the jury found the defendant tobacco company guilty of deceit in falsely leading the plaintiff, who died from heavy cigarette use, to believe that it was safe to smoke cigarettes. (*Philip Morris, supra,* 549 U.S. at pp. 349–350.) During the punitive damages phase of the trial, plaintiff's counsel urged the jury to consider how many other cigarette smokers in Oregon were going to die from smoking due to the same type of deceit by Philip Morris. (*Id.* at p. 350.) The Supreme Court held that the jury could consider the harm to other smokers in determining reprehensibility, but could not punish the defendant for that harm, impliedly by basing the award on a quantification of that harm. (*Id.* at pp. 355–356.) Here, the trial court instructed the jury, consistent with *Philip Morris*, that "[w]hether the particular defendant disregarded the health or safety of others" was relevant to the reprehensibility of the Defendant's conduct, but that

As to factor 5, the jury expressly found that the Individual Defendants committed intentional misconduct, and as explained *ante* much of the trial evidence demonstrated they used deceit and fraudulent concealment in doing so.

A finding of significant reprehensibility is also supported to at least some degree by factor 4, repeated actions. Although Asahi did not prove the Individual Defendants committed similar misconduct on other occasions against Asahi or other companies (cf. *Simon v. San Paolo U.S. Holding Co., Inc., supra,* 35 Cal.4th at p. 1180 [no evidence defendant acted similarly toward other buyers]), it did prove that they carried out their plan in a variety of ways over a period of several months (see *Textron, supra,* 118 Cal.App.4th at p. 1082 [factor applies because insurer persisted in its denial of coverage and defense for several months]).

In sum three of the reprehensibility factors tend to support the jury's punitive damages award.

The Individual Defendants understandably do not argue that the ratio of compensatory and punitive damages awarded by the jury was excessive: the compensatory damages as awarded by the jury were approximately $550 million and as reduced by the court were about $377 million; the total punitive damages awarded were $30 million. Nor do they contest the evidence and implied findings about their wealth or net worth. Because it can be inferred that their conduct was motivated by a desire to maintain the income or dividends they personally received as a result of Tracleer sales, the jury could reasonably conclude that the punitive damages award would have its intended deterrent and punitive effect only if it equaled at least 10 percent of their net worth.

Because there are grounds for finding significant reprehensibility in the Individual Defendants' conduct, because the ratio of punitive to compensatory damages is low, and because the deterrent and punitive effect of the award was achievable only if the award

---

"[p]unitive damages may not be used to punish a particular Defendant for the impact of his, her or its alleged misconduct on persons other than Asahi."

was significant with respect to the Individual Defendants' net worth, we conclude the punitive damages awards were well within constitutional standards.

> b.    *State Law Standards*

Defendants argue that "California law generally recognizes that 10% of net worth represents the outermost limit of punitive damages for even the most vile, loathsome, despicable conduct.  [Citations.] [¶] Here, the jury punished each individual defendant 10% of that person's net worth.  Yet under no rational sense of proportionality could it be said that the conduct of these individuals ranks them among the worst of all offenders. . . . Hence, the punitive damages . . . are excessive as a matter of law . . . ."  We disagree.

First, another division of this court recently reviewed several cases that purportedly support this argument and concluded that "none of the cited cases actually *held* that punitive damages exceeding 10 percent of the defendant's net worth are per se impermissible." (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 82 (*Bankhead*).)  Nor did those cases hold that the percentage of net worth awarded should match the degree of reprehensibility of the defendant's conduct.  On the contrary, both reprehensibility and wealth are relevant to the size of the award:  "Under California law, '[w]ealth is an important consideration in determining the excessiveness of a punitive damage award.  Because the purposes of punitive damages is to punish the wrongdoer and to make an example of him, the wealthier the wrongdoer, the larger the award of punitive damages.  [Citation.]'  [Citations.]  '[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.  [Citations.]'  [Citation.] . . . [¶] . . . Calculation of punitive damages 'involves . . . "a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants." ' [Citation.]" (*Id.* at pp. 77–78.)

Second, we must give deference to the trial court's factual determination that the punitive damages awards were not excessive as the result of passion or prejudice. " ' "The trial court is in a far better position than an appellate court to determine whether a damage award was influenced by 'passion or prejudice.' [Citation.]" ' " (*Bankhead,*

*supra,* 205 Cal.App.4th at pp. 76–77.) " 'An appellate court will not reverse the jury's determination unless the award as a matter of law is excessive or appears so grossly disproportionate to the relevant factors that it raises a presumption it was the result of passion or prejudice. [Citations.]' [Citation.]" (*Id.* at p. 77.) Those factors are "the nature of the defendant's wrongdoing; the actual harm to the plaintiff; and the defendant's wealth. [Citations.]" (*Ibid.*, fn. omitted.) Because we have already determined under de novo review that the punitive damages award was proper under these and similar factors, we necessarily reach the same conclusion under applicable state law.

E.      *Asahi Cross-Appeal:  Punitive Damages Claim Against Actelion*

Asahi argues the trial court erred in denying its motion for a new trial on its punitive damages against Actelion.  It contends that it is entitled to a new punitive damages trial due to intentional misconduct by defense counsel during closing argument. We disagree.

During closing argument in the punitive damages phase of the trial, defense counsel told the jury its liability verdict sent "a huge message to everybody[.]  [Y]our message was so loud that . . . [$]800 million has been lost in capital assets from Actelion," a figure that was based on a drop in the company's stock price after the liability verdict was announced.  Counsel added, "That isn't Actelion who lost the [$]800 million.  That's pension funds.  That's invest—" Asahi interposed an objection: "There's no evidence of this."  The court overruled the objection and said, "It will be up to the jury . . . what there is and is not evidence of."  Defense counsel continued:  "As a matter of fact, it's not only pension funds that are invested in Actelion, it's these people sitting right over here," indicating Actelion employees.  "[L]et's talk about the four entities that lost $800 million in just two days and let's talk about who that is. . . . That's employees, that's police and firemen pension funds.  That's teachers' pension funds. These are all funds that invested that got wiped out of $800 million."  "[W]e all know about pension funds.  That money doesn't grow on trees.  It comes from somebody[,] . . . comes from employers . . . ."  On rebuttal, Asahi did not argue that defense counsel's

comments about the financial impact of the jury's liability verdict on pension funds and employee stock options were unsupported by the evidence. After the jury returned its punitive damages verdict, Asahi moved for a new trial on the ground that defense counsel committed misconduct in arguing, without evidentiary support, that employees and pensions funds lost money as a result of the jury's liability award and would lose more money if the jury awarded punitive damages. The court denied Asahi's motion without explanation.

Although attorneys have wide latitude in making arguments to a jury, an attorney " 'may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences,' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796), and may not deliberately attempt to "appeal to social or economic prejudices of the jury" (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 552–553). "Usually, we defer to the ruling of a trial court on a new trial motion. [Citation.] ' "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and [the trial court's] conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong." ' (*Sabella v. Southern Pac. Co.*[ (1969)] 70 Cal.2d [311,] 318, fn. 5 . . . .)" (*Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 180–181.)

We first note that the defense argument complained of was at least partially supported by evidence in the record. An Actelion representative testified during the punitive damages phase of the trial that the company offered its employees stock option plans, and an Actelion annual report received in evidence during the liability phase of the trial stated that more than 40 percent of Actelion's investors were institutional shareholders. To the extent the argument was not supported by the trial evidence or reasonable inferences therefrom (i.e., the claim that Actelion's institutional shareholders were public employee pension funds), the court admonished the jury to determine for itself whether facts asserted in Actelion's argument were, or were not, in evidence, mitigating any prejudice. Asahi further had the opportunity in rebuttal argument to challenge the defense statements, but instead chose to focus on other topics, a choice that

suggests that Asahi did not view Actelion's argument as highly prejudicial at the time it was made.

In contending that the argument was improper, Asahi relies primarily on inapposite cases holding that references in argument to the wealth or poverty of a party is an improper appeal to the jury's sympathies and constitutes misconduct. (*Hoffman v. Brandt, supra,* 65 Cal.2d at pp. 551–553 & fn. 1 [argument that judgment against elderly defendant would send him to a nursing home for the poor]; *Du Jardin v. City of Oxnard, supra,* 38 Cal.App.4th at pp. 177–178 [argument that judgment against city would result in cost to taxpayers and loss of public services].) Such arguments are improper in trial of liability and compensatory damages because they are irrelevant to the issues before the court. (*Hoffman v. Brandt*, at pp. 552–553; *Du Jardin v. City of Oxnard*, at p. 179; see also *Love v. Wolf* (1964) 226 Cal.App.2d 378, 387–389 [wealth of defendant pharmaceutical company not relevant to liability or compensatory damages].) Trials of punitive damages are different. (*Love v. Wolf*, at p. 388.) In such trials, the wealth of the defendant is relevant because "[p]unitive damages are to be assessed in an amount which, *depending on the defendant's financial worth* and other factors, will deter [the defendant] and others from committing similar misdeeds." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 712, italics added.) Indeed, a plaintiff's failure to establish the financial condition of the defendant is a ground for reversal of a punitive damages award as a matter of public policy. (*Tomaselli, supra,* 25 Cal.App.4th at pp. 1282–1284.)

We do not view the defense argument as improper in context. The jury was properly instructed that in determining an amount of punitive damages, it should consider what amount would be sufficient to punish the defendant for its conduct and deter similar conduct in the future. "There is no fixed formula for determining the amount of punitive damages and you are not required to award any punitive damages."

Like Actelion, Asahi also argues, without supporting citation, that it is unprecedented for a jury to impose punitive damages on corporate officers and not on the corporation itself. Even if it is anomalous, we do not find the outcome here to be irreconcilable or inconsistent with the policies underlying award of punitive damage

awards. The jury reasonably could have determined that imposition of substantial punitive damages on the three senior Actelion executives who had personally directed Actelion's malicious or fraudulent activities would deter Actelion from committing similar misconduct in the future. Moreover, the jury could reasonably have found that imposing the financial penalty on the individuals personally would have a more immediate punitive and deterrent effect than imposition of penalties upon the corporation, impacting all stakeholders in the corporation, culpable or not.

### III. DISPOSITION

The judgments are affirmed. Asahi shall recover its costs on appeal.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.

Superior Court of San Mateo County, No. CIV478533, Marie S. Weiner, Judge.

Morgan, Lewis & Bockius, Thomas M Peterson, Rollin B. Chippey II, Benjamin P. Smith, Christopher J. Banks and Tera M. Heintz for Plaintiff and Appellant,

Mayer Brown, Evan M. Tager, Craig W. Canetti, Lee N. Abrams, Donald M. Falk; Cotchett, Pitre & McCarthy, Joseph W. Cotchett and Nancy L. Fineman for Defendants and Appellants Actelion Ltd., Actelion Pharmaceuticals Ltd., Actelion Pharmaceuticals US, Inc. and Actelion U.S. Holding Company.

Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Defendants and Appellants Jean-Paul Clozel, Martine Clozel and Simon Buckingham.